Haywood, J.
This is an ejectment for lot No. 110, in the town . of Nashville. This lot was drawn by S. Barton, as appeared by the plan of the town at the second drawing of lots in Nashville. Whether S. Barton was put down for Samuel Barton or Stephen Barton is unknown. In 1790 this lot was, by the commissioners of Nashville, conveyed to Stephen Barton. The defendant is in possession.
The defendant showed that in 1803 Samuel Barton, the father of Stephen, sold the lot to Roger B. Sappington for a full price, and gave Sap-pington a paper writing transferring it to him, who proved that at this early day he thought this a legal title. In 1806 Sappington conveyed to Dickson, and in the same year Dickson conveyed.to Whitesides. In 1808 Whitesides caused Sappington to get a formal deed from Samuel Barton. In 1806 Whitesides conveyed to Shall. Sappington took possession about 1803, and held until Dickson came in, who delivered possession to Whitesides, who held until Shall came in; so that the lot was in possession from 1803 to 1818, when this action was brought. The parties were in by regular deeds from 1808, except the deed from the commissioners to Samuel Barton. Stephen Barton was born in 1788. At the time of drawing the lot No. 110 he could not have been eighteen months old. Evidence was given to show that the conveyance was made to Stephen to defraud a creditor, John Buchanon, who had a considerable demand-on Samuel Barton. The judge of the Circuit Court charged the jury that, according to the later decisions of this Court, he conceived a regular chain of legal titles necessary to protect the defendant under the Acts of Limitations, or that a true equity would form the connection, if proven, or that an apparent *173 equity was necessary, that is to say, if Samuel Barton had drawn the lot and afterwards sold to Sappington, that then such purchase would form an apparent equity. Samuel Barton having once been the apparent owner, and having conveyed to Sappington, would be sufficient, though the commissioners had never conveyed to him, Barton, although Samuel Barton had conveyed to his son before he conveyed to Sappington. The judge also charged the jury that if Samuel Barton did draw the lot, and caused it to be conveyed to his son, Stephen, to defraud his creditors, yet Sappington could not take any advantage of this, because he was a purchaser, and that none but an execution creditor could take advantage of this conveyance. The jury found for the lessor of the plaintiff.
The principal question in this cause is, whether the defendant is in a situation to protect himself under the Act of Limitations, there being one link in the chain of title wanting, namely, a deed from the commissioners to Samuel Barton.
A new trial was moved for and refused. It was moved for on the ground that the verdict was contrary to evidence, under the charge of the judge, that if Samuel Barton paid for the lot, that then there would be such an equitable connection as would protect the defendant under the Act of Limitations. The counsel for the defendant urged that there was an abundance of evidence from which the jury were bound to infer that Samuel Barton paid for the lot in question, and it is strongly insisted on that the judge erred in charging the jury that the conveyance to Stephen Barton was good, as against Sappington, though made to defraud creditors.
These are the material facts upon which the judgment of this Court is requested.
If the jury believed that the lot was drawn by Stephen Barton, we cannot pronounce that they were mistaken, for the evidence to contradict the inference in opposition to that which proves it does not so completely preponderate as to make it nearly' certain the verdict is wrong, without which this Court cannot interfere to disturb it; and if this fact be not repelled by the verdict, the question cannot arise as to the legal effect of a voluntary conveyance made to the son to the prejudice of a subsequent fair purchaser, or as to the question whether a conveyance to defraud creditors is void as to subsequent purchasers as well as creditors. The jury may have been induced to find as they did — although they believed that Samuel Barton was the drawer of the lot— by the charge that a deed by Samuel to his son, to the intent to defraud creditors, was not therefore void as to purchasers ; and in that case they have been misled by the charge ; for, if a voluntary conveyance is for the most part taken to be void, from that circumstance unexplained, as to subsequent purchasers for value, it would certainly be no less infected with turpitude when proved to have been made to defraud creditors, both of them being included in the words of our Act, and deeds of both *174 classes being void as to such persons whose estates might thereby be “ disturbed, hindered, delayed, or defrauded,” 1801, ch. 25, §2. This Court need not come here into any decision upon this point, as there is another in this case, which is the main one, and of so much importance that it cannot be passed over without giving a plain and pointed opinion upon it. If decided by the Court against the opinion of the circuit judge, as I think it ought to be, it,will then be an unavoidable consequence that the verdict and judgment of the Circuit Court cannot stand.
It is this, whether can the defendant be protected by the Act of Limitations, there being no deed from the commissioners to Samuel Barton, to complete the chain of conveyances from the grantee to the defendant in possession.
Before the year 1793 and up to that period, the Act of 1715, ch. 27, received the same construction as did the statute of James the First by the judges of England. Possession for seven years barred the right of possession which had been in the plaintiff, vested the same in the possessor, and barred the claim of ejectment founded upon the right of possession in the- plaintiff. It left the right of property in the plaintiff, and an action founded upon that right of property.
About 1793, or soon afterwards, the design was conceived of rendering this Act a perpetual bar, not only to the action of ejectment founded upon the right of possession, but also to all actions founded upon the right of property and to vest an absolute fee in the possessor. It was a design in face of all former decisions and could not but meet with much opposition. The words of the Act which favored the position were to be selected, and [1] arguments to support it. The perpetuity of the bar was countenanced by the words in the end of the proviso, § 4: “ but that all possessions held without suing such claim shall be a perpetual bar against all and all manner of persons whatsoever, that the expectation of heirs may not, in a short time, leave much land unpossessed, and titles so perplexed that no man will know of whom to take or buy land.” As the bar was to be perpetual and titles to be settled, therefore it was argued that the defendant was perpetually protected, and his title rendered perpetually indefeasible. On the other hand it was urged that there was only a perpetual bar to his right of possession, and that the term “ title ” legally related to the right of possession only, and did not include the right of property, and left the same wholly unaffected and in the same plight as if the Act of 1715 had never been'passed.
Mankind would never agree to a perpetual bar of the right of property, if it were to be conceded to a mere naked possessor, who came upon the land without any reasonable pretence and knowing himself at the time to be a violator of the law. It could not be carried that the infractor of the law should *175 be rewarded by it, with an estate in fee, for his contempt of it. Either he must be excluded, or the perpetuity of the bar could not be established in contravention of received opinions. The possessor must have color of title, and that was said to be deducible from the words “ and titles so perplexed, &c.” implying that conflicting titles were to be settled by possession, not controversies between titles and naked possessions. It has been agreed at all times and universally, ever since the passage of the Act of 1715, that the land to which title could be acquired by possession, must be land which did not belong to the lords’ proprietors ; for the clear meaning of the Act was to settle titles derived under them, not take away their land by possession. And in order to have the benefit of the Act, that a grant should be shown from them transferring the land to some individual owner. And collecting the requisites called for by the Act of 1715, they appeared to be these ; the production of a grant to them, that the lands were not vacant, a color of title to show that the possessor was not a mere trespasser, and color to show the extent of his possession ; that he had kept possession for seven years without the interruption of an entry or claim made by the plaintiff. Upon showing all these he was entitled to the absolute fee simple and could never be turned out of possession.
This new system was opposed from 1793 to 1804 in North Carolina, and was then finally established by the Court of Conference, then the highest tribunal in that State. The public attention was also drawn to the subject in this State by some recent decisions made in our courts. The people were not satisfied with some parts of the Act of 1715 as being not favorable enough to the possessor, and as to some other parts which remained unsettled they wished to put them beyond doubt. Naked possession they wished to put down. It had there lately succeeded as I have been informed. They passed the Act of 1797, ch. 43, §§ 3 and 4, every provision of which was for the better security of the possessor with color of title, because he lived here and was our citizen, in preference to those foreigners who lived in all parts of the world, and had never contributed to wrest the country from the hands of the savages, nor had participated in the dangers and privations endured in the establishment of our settlements upon it. To favor our own people, they provided that a possession should not for the future be defeated by entry or claim, but by action only ; that a bare naked possession’ should not be protected; that persons beyond seas must sue within seven years; that an erected possessor, who had settled under color of title, should be paid for his improvements; and that the bar should be perpetual. They closed the controversy as to naked possession and as to the perpetuity of the bar; for entry or claim substituted an action, and in the worst event that could happen to a possessor indemnified him by compensation for his labors, which could not be otherwise than liberal, considering the mode of assessment, and narrowed the indulgences *176 formerly given to transmarine claimants. All these provisions were for the greater and better security of our own people; and surely it must be admitted that construction ought not to be to their disadvantage, for that is at war with the spirit of the Act and the manifested will of the Legislature. We may here get a clew that will lead us to an accurate view of its sanctions. To be convinced that under the Act the grant is to be produced for the purpose of showing that the land is appropriated and not vacant land, we only have to consider that any other evidence proving the same fact will do as well; for instance, an act of the Assembly appropriating 200 acres of land for the town of Nashville.
To show that the deed is to prove a color of title, or in other words, that the possessor is not a mere trespasser known to himself to be so, we have only to consider that any other evidence which proves that fact will do as well as the deed; as devise or heirship. Considering, then, that any evidence which proves these facts will be good evidence, and that any other evidence which will not prove th'em is not good evidence, it will follow clearly that these are material facts, and that they may be established by any competent testimony, and are not confined to the instances put in the Act which are only put for examples.
The Act of 1797, taken according to its natural meaning and the common acceptation of its words, would have accomplished the desirable end which the Assembly had in view ; but unsuspectingly the term was used therein “ or deed of conveyance founded upon a grant,” which received a construction in 1814 in the case of Elliot v. Lillard, which, ever since that period, has been • the groundwork of forensic disputation. It was said by one of the judges in that case, that the words “ deed of conveyance founded upon a grant ” cannot be satisfied but by a chain of legal titles without any chasm between the grantee and the possessor, and that a deed to the possessor without such connection or chain of title would not be sufficient. It was afterwards added in 1815, that an equitable title would serve as a link in the chain, and in 1821, it was said that an apparent equitable estate would answer the same purpose. The opinion opposed to this was satisfied with a deed to the possessor without any connection of title and without any other color than the deed itself. Such was the meaning of the Act of 1715, as finally settled then ; and such it was contended was the Act of 1797, which had the same object precisely in view, that is to say, to prove the fact that the possessor was not a trespasser known to himself to be so, and that there was no more difficulty of proving, the fact imposed by the Act of 1797 than there was by the Act of 1715. Nor did the Act of 1797 require more evidence of the fact than did the Act of 1715.
Embracing the opinion, as I do, that a deed alone is necessary to prove this fact, and that the Act of 1797 does not require any evidence of the *177 fact, it is incumbent upon me to show my reasons for dissenting from this opinion.
If there he a deed which the bargainee believed to convey the title to him, it will then show the requisite fact that he is not a trespasser known to himself to be so, and is not that purpose as well answered by the production of one such deed as by a regular chain of deeds ? If the second grantee has never complained, shall the first be permitted to say, You occupied without the consent of the second grantee, and of this wrong done to him I will avail myself to defeat both you and him .and to turn you both out of possession ? Suppose the Legislature had, in express words, required a chain or connection as they have a grant and deed, and the object in the latter instance could be obtained by some other evidence as well as by the connection, would not the fact be established by it in this latter instance by other than the specified testimony, as well as in the former instances, when the act of Assembly is taken in place of the grant and the devise or heir-ship in place of the deed P What is there to render connection the only species of evidence which alone shall be received to establish the fact that is capable to be proved in so many ways, when the law will not in any other instance reject evidence which will make the requisite proof? Suppose there be a void execution and sale by the sheriff under it, and seven years’ possession under the sheriff’s deed, here is no connection between the possessor and grantee, yet will not this deed show that the defendant is not a trespasser known to himself to be so; and if the requisite fact be established, though by other testirhony than that which the Act specifies, shall not the fact be equally effectual as if proved by specified evidence ? - Suppose some case heretofore put, that A, in England, makes a power to B, in Tennessee, to sell and convey his lands in Tennessee, and then die, and B the next day after his death sells and conveys to C, who pays the purchase-money, which is remitted to the executors of A, who receive it and pay his debts with it, and C lived seven years upon the land, and is then sued for it by the heirs of A; here is no connection by deed between A and C, yet does not the power and deed show that C was not a trespasser known to himself to be so ? And shall he not have the same benefit from the fact as if proved by the exact means specified in the Act ? A dies leaving sons, B and C, whereof B was born before marriage, and C during the existence of the marriage. During the life of the parents they were both supposed to be legitimate. B sells his share to D, who continues seven years in possession and then is sued by C; here is no connection of titles by deed from A to D, but do not the reputation of the country and the deed from B show clearly that D was not a trespasser known to himself to be so, and ought he not to have the same benefit from the fact as if proved by the specified evidence ? A is the grantee of land in Tennessee, who conveys the same for valuable consideration to B, who *178 makes a power to C to sell and convey the same, who sells and conveys accordingly to D. The deed to B was registered in North Carolina, but never in Tennessee. D remains twenty years in possession, having paid the purchase-money to C, who remitted it to B. The deed and power are both burned in the house of C; here is no connection between D and the grantee, who, we will suppose, was the second grantee; yet does not the evidence prove completely that C was not a trespasser known to himself to be so? And ought he not to be protected under the Act of 1797 as much as any other possessor of the same description ? Deeds proved, but not legally registered; registered but not in time, or not in the proper county, not in legal form, without consideration expressed, not under seal, not in the form of a conveyance but of covenant, agreement, or will, or otherwise objectionable for any of the numerous defects imputable to deeds of conveyance; sheriff’s deeds for lands which have been sold for the taxes, but not legally, or by process which is not in the legal form, or upon judgments not legally entered, or upon executions not issued against the real owner of the lands, but against one who is understood to be so, and in other cases in which the deeds are void in their origin, and which for these or any other objections cannot be read in evidence to prove a link in the chain, can never be made good by possession under this rule, because, by their rejection, the chain can never be made perfect. Lots in towns, transferred by indorsements which never were registered, or the delivery of certificates stating who were the drawers of lots, or the delivery from hand to hand of orders to the commissioners to convey to the holder, or short memoranda made in writing not under seal of the transfer of lots, could not be given in evidence to establish the connection. The fact to be proved is regarded of less consequence than the special means by which it is to be proved, and it is rather to be supposed than established by any equivalent mode.
And hence results the most pernicious consequences. All these cases, and innumerable others, by the doctrine of connection, are utterly excluded from protection by the Act- of 1797, though they were entitled to it under the Act of 1715. If connection was intended by the Legislature, then this exclusion was intended, but if the exclusion was not intended, then neither was connection. It is impossible to believe that the Act of 1797, providing for the better security of possessors in all other instances, could have meant to exclude almost all of their former protection. It is therefore to be concluded that the doctrine of connection is not supported by the words “ or deed of conveyance founded upon a grant.”
Connection made out in evidence is one mode of proving that the possessor was not a trespasser known to himself to be so, but if not made out, and the fact be otherwise proved, it ought to be equally available. It should not, in reason, be rigorously restricted to a particular sort of evi *179 dence, when the same rigor is not observed in any other instance and when the cases are infinitely more numerous where the fact can be proved, but not by this evidence, than those in which it can be so proved. What injurious consequence will follow if it be proved by other means ? None at all! Then why such obstinate prejudice in favor of connection, more than any other mode ? A preference so extremely fatal could not have been intended without a correspondent advantage, and if there be none such, it could not have been intended at all, and the doctrine of connection is unsound.
When the doctrine of connection was first countenanced by judicial allowance, a chain of legal conveyances was deemed requisite. The consequences were soon perceived, and their pernicious operations were acknowledged by the attempt to confine them by the addition of “ equit.able estates,” to assist in forming the chain. The remedy was but partial, and a new one was added under the name of “apparent equities,” and still it fell short of the evils to be remedied. Many cases were yet excluded from protection which had it under the Act of 1715. The sale made after the death of him who gave power, that made by the eldest son in the case before cited, and numerous other instances, give no equitable estate to the purchaser, nor any apparent equity. In all such instances the additions that were made of equitable estates and apparent equities, give no relief to the excluded occupier. If all were entitled to relief by the Act of 1797 who were entitled to it by the Act of 1715, then a construction or remedy which gave relief but to some, was inadequate to the purpose intended by the Act, fell short of its objects, and cannot be correct; so far, at least, as it falls short, it should be esteemed as no remedy at all. And what then follows ? The remedy attempted being an acknowledgment of an evil flowing from connection, and it being incurable by the remedy applied, must still have the same effect as before the attempt, and that is, to show that the source is poisonous from whence are derived consequences so repugnant to the spirit of the Act of 1797, and the interests of those who were intended by it to be better provided for than they were before; and as connection is that source, that it cannot be supported by sound interpretation. The remedy attempted to be applied is itself liable to animadversion, besides its incompetency.
It is a rule of law that equitable estates shall not be decided upon in trials at law; 5 East, 157; 1 Sch. and Lef. 67; 2 Johnston, 221; 7 East, 23; yet here it is to be brought forward in trials at law, without bill, answer, or any of the means used in courts of equity, for eviscerating the truth, and to be decided upon by juries who have no knowledge of the rules which govern courts of equity.
Every day we are told that equity must not interfere with matters triable at law. How much more perplexing is it for a court of law to de *180 termine matters which are purely equitable; and what is the equitable title here referred to ? An equitable estate arises by the obligation of the legal owner to convey at a future day. From him who is not the legal owner no equitable estate can be acquired, and it is admitted on all hands that the second grantee or his bargainee is not the legal owner; his covenantee cannot have an equitable estate. What is meant by equitable estate, as lately applied to the Act of Limitations, can only be matter of conjecture; it may be such a contract between the possessor and second grantee or bar-gainee under him, as if the legal estate were in the covenantor, would make an equitable estate in the covenantee, or, as finally it was called, an apparent equity. Equitable estate and apparent equities, as here used, must be something distinct from a real equitable estate, and the foregoing is a probable conjecture of what is meant. Terms of undefined signification ought, if possible, to be avoided, because they place in the hands of judges engines of the most destructive quality, which may be employed to ruin some and save others, according to the discretion of him who uses them. If equitable estates may ruin and save occasionally, for goodness’ sake let their signification and extent be defined, and let them not be capable of expansion and contraction at pleasure, for then we must worship judges, as the people of some countries do malevolent beings, to keep them from doing us harm.
It is not pretended that these equitable estates, or apparent equities, make the legal title more perfect than it would be without them, arid therefore must be admitted for some other purpose; that is, to make the possessor have color of title, or, in other words, not to be a trespasser known to himself to be so. If he enters into possession under a covenant or written unsealed contract, as in the case of Richards v. Roberts, or verbal agreement to pay for the lands, his possession will be available, though he has no deed as the Act requires. An unsealed written certificate of a-contract never carried into execution has been taken in the case last mentioned to be an apparent equitable estate. Knoxville, May Term, 1822. Why not, likewise,- a verbal agreement and possession under it ? And if the verbal agreement cannot be expressly proved, why not presume it and payment from many years’ possession and acting as owner all the time ? Thus parol evidence is introduced, and subornation of perjury with it, to establish connection as a proof of innocent possession. And this is the very mischief which the Act of 1797 guarded against, by requiring a deed founded upon a grant.
Is it not better to presume innocence of possession directly from a single deed, than to do it from connection which may be founded upon corrupt parol testimony? Moreover, if-unsealed memoranda, parol evidence or prescription will serve to establish connection, why not a deed unregistered or not rightly registered, which can be proved on. the trial, and contains in *181 the body or on the back that the purchase-money is paid ? Why not, if the deed be lost, or destroyed, prove the contents by a copy or extract, or by a witness who has seen it? If connection with more links than one can be established by parol, then, if there be only one link in a deed wanting, it is inevitable that it shall be proved by the testimony before mentioned, and then the deed required by the Act is proved by unsealed memo-randa or parol. Is this evidence more eligible than the deed required by the Act, and is it correct to make a substitution so very important, under the idea that nothing must be substituted in place of what the Act requires; namely, connection ?
Again, why is a deed required to show a color of title or innocence of possession, because the title to be ripened by possession into a perfect title is a legal one, and is to become a perfect legal title ? And can an equitable estate, or an apparent equitable estate, be ripened into a legal one ? A is the grantee, and he covenants to convey to B, who continues possession for seven years; does his imperfect equitable estate become then a perfect legal one ? If not, an equitable estate cannot form a link in the chain. His equitable estate, or apparent equity, cannot be converted into a legal estate; and whoever claims under this equitable estate can have no more than an imperfect equitable estate or an apparent equity, which cannot be ripened into a perfect legal estate. The possession of one equitable owner is the possession of the legal owner under whom he holds possession, and his possession perfects the estate of the legal owner, but cannot convert his own interest into a legal estate. The Act of Limitations cannot in one breath transfer the legal estate from the legal owner-, and bar the first grantee. It operates upon the latter and bars him, but not the former, because the possession has not been adverse to him, and because, also, if transferred frpm him without a decree, he would thereby lose the incumbrances, equities, and liens which he had by means of the legal estate in his hands. He might say, if a decree were prayed for against him, Do this and the other thing, to which I am equitably entitled, and then take from me the legal estate, but not before. The possessor, therefore, under an equitable estate cannot acquire a legal title to himself, though for the legal owner he may. As an equitable title cannot become a legal one, it cannot be deemed a good link in the chain for that purpose, for every subsequent link can be no more than an equitable estate like itself. Everything short of a legal conveyance, which shows a possession taken by consent of the second grantee or bargainee, must be used to show a possession in him by his tenant, and a confirmation of title in him by the Act of Limitations. That will prevent the recovery of the plaintiff or first grantee, but will make no title in fee for the actual possessor. Equitable estates and apparent equities, introduced as remedies for the pernicious effects of con *182 nection, being thus incapable of curing the evils they were meant to redress, should be laid entirely aside.
This doctrine of connection is exceedingly hurtful in another point of view. Under its operation the longer one remains in possession the more danger there is to his title. The intermediate evidences of title more liable to be lost in the lapse of a hundred years than of seven years, and if any of them, by the burning of public offices or of private houses, by the intrusion and devastations of war, or other natural or general calamity, be lost so that the chain is broken, the title is gone if connection be indispensable.
Again, if the Legislature has really informed us by the words “ or deed of conveyance founded upon a grant,” that no other'evidence but a grant or deed of conveyance connected with it shall be allowed to prove a color of title, how is it that an equitable estate or an apparent equity proved by unsealed writing or by parol, can be received in place of it ? Either it is not true that a connection is the only allowable medium of proving the innocence of possession, or it cannot be true that the substituted evidence of equitable titles and apparent equities can be proper. Reject the latter, and the consequences of connection are too intolerable ever to be submitted to, and connection must be removed.
Taking into view the numerous and immense mischiefs which ensue upon the doctrine of connection and the title good, if any to be derived from it, the tribunals of the country should not adopt it unless by the express direction of the Legislature.
The words “deed of conveyance founded upon a grant,” “ have not necessarily this meaning and no other, if they have it at all”; for in this same Act of 1797, eh. 43, § 3, the same words are used and have uniformly received a different construction: Sec. 3, “ Be it enacted that any grantee or other person claiming by deed of conveyance founded upon a grant, hath by virtue thereof obtained peaceable possession of any tract of land, and shall at any time thereafter be dispossessed by due course of law, or otherwise put out of possession without his, her, or their consent first had and obtained, that then, in that case, the person so dispossessed shall be entitled' to, recover at common law from the person to whose use the dispossession was so made, the value of the improvements which he, she, or they may have made on the said land,” &c. It never was deemed requisite under this clause of the Act for the evicted tenant to show a connection from the grantee to himself.
In Elliot v. Lillard, where the defendant had a deed from a man of the same name with the grantee, but not really the grantee, he would be entitled, upon eviction, to satisfaction for improvements, though he could not establish a connection between him and the true Elliot. If the law be not so construed, then in every ease where there is but one grantee there can be no satisfaction for improvements, For if there be a connection *183 between the possessor and grantee, the latter cannot recover at all. And if the evicted tenant can recover at all, it must be because he cannot establish a connection, but only a deed and nothing more. A connection cannot be required without rejecting this whole clause, so far as regards occupation under deeds when there is but one grantee. And as most manifestly this could not be the will of the Legislature, it is demonstrably true that the term “founded upon a grant” does not here mean connection. And it being a rule of construction that the same words used in different parts of a statute are to receive the same interpretation, it is through this medium demonstrable that the words “founded upon a grant in section 4” must be understood to signify a “ deed without connection.”
The Act of Limitations is a law of presumptions; it presumes evidence from length of time which cannot now be produced, payment which cannot now be proved, deeds which cannot now be found, releases which cannot now be shown. The time for raising the presumption is fixed by the act of the Legislature, instead of being left to the arbitrary discretion of a jury. A possession not known to be tortious to the possessor, but believed by him to be otherwise, at the end of seven years is presumed to have been founded upon all the evidences of good title which the law requires. The Act should be so construed as not to defeat the presumptions which it is intended to establish. Yet, by this rule of connection, possession for seven years under a deed shall not raise the presumption of omnia rite acta. The deed is not taken as proof of a possession not tortious in its commencement, unless to it be added all the preceding conveyances which could legalize it. And presumption is not allowed to establish these preceding evidences if it be true that nothing but deeds, equitable estates, and apparent equities will do, and not presumptions also from length of possession. If there be a single grantee, A, and two conflicting titles in B and C, and C has been long enough in possession, a deed from A to C may be presumed ; Patton’s Lessee v. Hynes. Suppose two grantees and two conflicting titles in B and C, and C has been as long in possession and under the same circumstances precisely, should not a deed to him be presumed in the same manner although he has no deed or equitable estate or apparent equity to show ? And if this addition to the rule of connection be admitted, why .not any other addition as reasonable and proper ? And how is it then true that none but the specified evidence can be received? Either this latter position must be rigidly adhered to, or other proof will do besides that which is supposed to be specified in the Act, and the only thing requisite under the Act is the fact that the possessor was not a trespasser known to himself to be so. And that it is perfectly immaterial whether it be proved by a single deed or by a concatenation of deeds, or whether it be proved by an exhibition or presumption of deeds.
After all the emendations which can be superadded to the rule that re-. *184 quires connection to prove the innocence of possession, many cases will remain uncomprehended which were within the Act of Limitations of 1715. A rule so inflexible in the wrongful exclusion of meritorious claimants, so unjust in operation towards them, so unfriendly to the spirit and genius of the Act of 1797, so uncongenial with the public repose which this Act meant the better to secure, seems to me to be opposed by all the considerations which combined in making the law. And according to the best judgment I am able to form connection is not essential under the Act of 1797.
Being thus unequivocally wrong and destitute of individual rights in a very extensive and eminent degree, it cannot in my apprehension be the duty of the present judges, because of any judgments already pronounced, to adhere to the rule of connection. Comity is not entitled to so great a sacrifice ; uniformity of decision is of far less moment than the security and repose of the whole community. The end in this instance is greater than the means; it should remain though the means perish; the latter should be resigned to fate whenever they are found to be incompatible with the great object to be obtained. And in proportion as the end is of greater magnitude and moment to the welfare of the whole State should be the readiness of the judicial functionaries, in my poor opinion, to abolish or alter them. Hai'dly a day passes but we make a new rule of practice, or a new decision in commercial and other cases to avoid the evils which would otherwise fall upon society; and are we obliged to suffer the utter destruction of many real estates, and agricultural citizens and their families because of a bounden duty to adhere to precedents, when that precedent is in our opinion most undeniably erroneous ? And more especially, shall we be tied down by precedent when, as here, the object is the same whichever course be pursued, and the course varying from that which precedent prescribes is found to be preferable to the other, and that prescribed is found to be subversive of its object and extremely detrimental to the general welfare. My feeble conception is that such aberrations cannot be sanctioned by repetition ; and that appropriate remedies should be applied as soon as opportunities offer for reinstating the law on its proper foundation. A new precedent was established in Walton and Shelley, in 1786, by the unanimous opinion of all the judges present, and was altered by the same Court upon solemn deliberation, 1798. Why? Because incompatible with the law as it existed in 1786, and with the attainment of justice in many instances. In 1 Term. 758, in the year 1787, a doctrine after long acquiescence was deliberately confirmed, yet it was afterwards exploded in 2 Term. 684, in the year 1788, and why ? Because found to be an unsalutary and useless deviation from the law as it was understood before the deviation commenced. A rule was established in this State, Lydia and Puckett, which was founded upon a previous decision of the late Supreme Court, that a grant upon a military warrant of land out of the military district was *185 void, but this rule was altered in three years afterwards hy the opinion of-Whyte, Roane, and Haywood, judges, who declared that such grant was not void. It was decided hy Roane, Whyte, and Haywood, judges, that there might he an appeal from the County Court making an order for the laying out of a road ; seven years afterwards Whyte and Emmerson, judges, decided the contrary, and that the cause could only be removed into a superior court by certiorari. A similar occurrence took place in Knoxville a few terms ago, relative to a rule of practice in equity which had been established by Roane, Whyte, and Haywood, judges, in 1816, and these corrections have all been submitted to.
The rule for assessing damages upon a breach of a warranty of land was never altered in this State till about the year 1814, when, in the case of Talbot and others, then it was corrected and changed from what it had been by H. L. White and Overton, judges, and no one ever complained. Wherever a decision has been settled by a series of adjudications, has been submitted to and for some time acted under, and is not manifestly repugnant to some rule of vital importance in the system, it should not lightly be departed from, nor for purposes which are not of the highest value to the community. On the contrary, where the thing determined is of recent origin, not supported by any former precedents, not acquiesced in by the profession nor by the people, met with general dissatisfaction, opposed constantly by the profession and by the community; inconsistent -with the general spirit and policy of our laws, greatly injurious, to individual rights, ruinous to the public peace, disapproved of by some members of the judiciary and of the bar, who were as it were born and raised in the country, grew into manhood with its laws, and either advised or aided in the formation of the laws to be construed, and participated in nearly all the decisions which have been made upon them anterior to a late schism, and who, by their opportunities, had an intimate knowledge of the people, their wants, habits, circumstances, modes of thinking, it cannot certainly be right to believe that such decisions, first commenced in 1815, can at this day, 1823, be so sanctioned by age and popular veneration, as to be, like the holy ark of the covenant, too sacred to be touched. Such, in sober seriousness, are the characteristics of these decisions. Judge Emmer-son, after nine days’ investigation into the subject in January, 1821, declared as to this point in the words following: “ As to the point now under consideration, it is believed that so far from being settled by prior adjudications of a character precluding.future examination, it is most eminently entitled to the appellation of vexata questioThe decision then made in the case of Harris and Holmes, by Whyte and Emmerson, judges, against the opinion of the third judge of the Court, was received, it is well known, with great and general dissatisfaction of the bar, and was against the opinion of the people and of the Legislature, expressed in their Act of *186 1819, ch. — , which, though not authoritative, is very respectable, has been ever since opposed whenever an opportunity offered by the profession, and it is in direct opposition to the opinion of two judges of this Court, delivered in the case of Darby and Mc’Connel, in the year 1818,'at Charlotte, or in 1819. Balance the opinion of the dissenting judge in 1821 with *one of the other two who gave the opinion, that of Judge Emmerson for instance, and then say, Must we be btiund to follow a rule laid down so lately, and under such circumstances, which we believe to be in direct opposition to the law of the country and the best interests of the people, or shall we pass it over in silence and return to the law we have left ? I think the cool and impartial answer must be, Let us return. Prior to 1814, the rule of connection had not been mentioned. From that time to this it has never been acquiesced in. It has no great intrinsic merit to recommend it, and threatens the public with general calamity. In my judgment, which, however, I do not pretend to put in opposition to the much better judgments *of many of those who differ with me in sentiment, but which, notwithstanding, I deem it my duty to follow, the doctrine of connection is against law, and the only requisites for the protection of titles, so far as regards this point, is a deed and seven years’ possession and nothing more, and that the judgment of the Circuit Court in this case, being founded upon the incompleteness of the connection, ought to be reversed.
BROWN, J. said it was well known to the profession that this had for many years been his way of thinking on the statutes of limitation; he had contended on that side of the question and combated the opinions adverse to the principles assumed in that just delivered.
If it be said that impressions made while under the influence of those feelings common to an advocate in favor of his client ought not to be brought into Court and set up as the rule of decision, he answered it was his opinion abstracted from any such bias, and remained after the able argument on the other side heard in this cause, and after all the reasoning urged by the judges who adopt the opposite doctrine, unaltered.
But those judges, venerable for their learning, were doubtless as well persuaded of the correctness of their opinions, and being entitled to much respect, he ought not, hastily, on coming to the bench, to conflict with them on a point so important and so long under the consideration of our courts.
He might err; he did not wish to do it, and thought, at least for himself, it would be prudent to advise upon the subject until the next term of this Court. Judge Haywood, he said, has had the question under consideration for ten years. He was doubtless well prepared to deliver his opinion.
Peck, J. During the argument of this cause I have been unavoidably absent, and regret that I have not had the benefit of the able discussion had upon a question exciting so much interest, especially as my opinion is called for with the other judges. Judge Brown has heard what has been *187 urged on either side, and deems it proper to advise until the next term. Situated as I am, it is more reasonable that I should advise.
Note. —This case is cited in Rafferty v. Turley, 3 Sn. 171, for the remarks of Haywood, J., page 231, 232, on the subject of revising former decisions. — Ed.
I have heard the opinion delivered, have had the perusal of it at my chambers, and must say it will be hard to persuade me it is not irresistibly conclusive.

Curia advisare.

 Original Note. — According to copy. — Pus.