KEVIN JON WEIDENBACHER *v.* DONNA J.
DUCLOS ET AL.
(14942)

PETERS, C. J., and CALLAHAN, BERDON, NORCOTT and KATZ, Js.

Argued February 10—decision released July 4, 1995

*Richard G. Kent,* with whom, on the brief, was *Stuart M. Katz,* for the appellant (petitioner).

*Louis RisCassi,* for the appellees (respondents).

BERDON, J. This appeal raises an issue of first impression for this court: Whether a man who alleges that he is the biological father of a minor child has standing to establish his paternity when the mother, at the time of the child's birth, was married to another man.[1]

In this petition for a writ of habeas corpus, the petitioner, Kevin Jon Weidenbacher, seeks custody of, or, in the alternative, visitation with, a minor child, Grant Duclos.[2] In his application for the writ, the petitioner alleges that he is Grant's biological father. The respondents, Grant's mother, Donna Duclos, and her former husband, Edward Duclos, deny that the petitioner is Grant's biological father. The matter was referred to a state trial referee, *Spallone, J.,* who appointed an attorney for the minor child.[3] The trial court then

[1] For purposes of this opinion only, when we refer to a child born in wedlock, we refer to a child who was born during the time that the mother was married, regardless of whether her husband was the biological father of the child. Likewise, when we refer to a child born out of wedlock, we mean a child whose mother was unmarried at the time of the child's birth. We emphasize that in using these phrases, we are not interpreting the meaning of the phrase "child born out of wedlock" as it appears in General Statutes § 46b-172a or in any other Connecticut statute. See footnotes 10 and 11.

[2] In order to protect the privacy of Grant, we ordinarily would use fictitious names in referring to the parties in this child custody case. Because the parties have not requested us to do so, and because the Appellate Court's published opinion disclosed their names, we do not do so in this case.

[3] We agree with the trial court's decision to appoint an independent attorney to represent the minor child in this case. In *Nye* v. *Marcus,* 198 Conn. 138, 146, 502 A.2d 869 (1985), this court indicated that during a hearing on the issue of standing the appointment of an attorney for the child is discretionary. We believe that in a case such as this, which would inevitably require an evidentiary hearing on standing that would implicate the integrity of the marital family unit and the privacy rights of the individuals involved, "the better course is to appoint independent counsel" for the child. *Yontef* v. *Yontef,* 185 Conn. 275, 284, 440 A.2d 899 (1981). In

raised, sua sponte, the question of whether the petitioner had standing to pursue his claim,[4] and the respondents subsequently filed a motion to dismiss on this ground. After conducting an evidentiary hearing on the issue,[5] the trial court concluded that the petitioner lacked standing and dismissed the action. The petitioner appealed to the Appellate Court, which affirmed the judgment of the trial court,[6] and we granted the petitioner's petition for certification to appeal.[7] We reverse the judgment of the Appellate Court.

For the sole purpose of determining whether the petitioner had standing, the following evidence was submitted to the trial court. In 1988, the petitioner and Donna (Antonson) Duclos were living together in New

this case, for example, the relationship between the child and the petitioner, who claims to be the child's biological father, may be of particular importance.

[4] The question of standing implicates a court's subject matter jurisdiction and, as such, may be raised at any time during the proceedings. "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. *Housing Authority* v. *Local 1161*, 1 Conn. App. 154, 157, 468 A.2d 1251, cert. denied, 192 Conn. 802, 471 A.2d 244 (1984). Further, the court has a duty to dismiss, even on its own initiative, any [portion of the] appeal that it lacks jurisdiction to hear. *Sasso* v. *Aleshin*, 197 Conn. 87, 89, 495 A.2d 1066 (1985)." (Internal quotation marks omitted.) *Tomlinson* v. *Board of Education*, 226 Conn. 704, 717–18, 629 A.2d 333 (1993); see *Daley* v. *Hartford*, 215 Conn. 14, 27–28, 574 A.2d 194, cert. denied, 498 U.S. 982, 111 S. Ct. 573, 112 L. Ed. 2d 525 (1990) ("the question of subject matter jurisdiction, because it addresses the basic competency of the court, can be raised by any of the parties, or by the court sua sponte, at any time").

[5] "When issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses." (Internal quotation marks omitted.) *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 695–96, 600 A.2d 1019 (1991).

[6] *Weidenbacher* v. *Duclos*, 34 Conn. App. 129, 640 A.2d 147 (1994).

[7] We certified the following issue: "Does a putative father have standing to bring a habeas corpus action to establish his paternity of a minor child that is born in wedlock?" *Weidenbacher* v. *Duclos*, 230 Conn. 901, 644 A.2d 917 (1994).

York City. In January or February of that year, Donna became pregnant. She was not dating anyone other than the petitioner at the time. In March or April, Donna told the petitioner that she was pregnant, and that he was the father of her unborn child.

That summer, in August, 1988, the petitioner and Donna ceased living together, although they continued to talk on the phone virtually every day. On October 14, 1988, unbeknown to the petitioner, Donna married Edward Duclos. Two weeks later, on October 31, 1988, Donna gave birth to Grant. Donna informed the petitioner a few days later that she had had the baby. She did not tell him, however, that she had gotten married.

Although Donna moved to Connecticut from New York, she and the petitioner kept in contact during the next few months. At some point, she told him that she had married Edward Duclos. In February, 1989, when Grant was four months old, Donna telephoned the petitioner and arranged a visit. Shortly thereafter, Donna and Grant traveled to New York to meet the petitioner. It was the first time that the petitioner met Grant.

Donna and Grant continued to visit the petitioner an average of twice a month, staying for "long weekends," or three days at a time. They also talked on the phone almost daily. At some point, Donna told the petitioner that she had gotten divorced. In fact, however, she and Edward Duclos were only separated. The petitioner thereafter asked Donna on several occasions to marry him, but each time she refused. In June, 1990, Edward Duclos filed for divorce, and the petitioner became aware that the dissolution of the Duclos marriage had not yet taken place. On November 14, 1990, the marriage was dissolved. The decree of dissolution found that the couple "have one minor child, issue of the marriage of the parties, Grant E. Duclos," and ordered Edward Duclos to pay $135 weekly in child support and to maintain health insurance for the child.

Beginning in early 1989, when Donna first visited the petitioner in New York after Grant's birth, the relationship between the petitioner, Donna and Grant became more involved. The three took several vacations together, traveling to Montauk, New York; Newport, Rhode Island; Tucson, Arizona; Mexico; and Hawaii.[8] Grant called the petitioner "Dad" and "Kevin," and Donna told everyone they knew that the petitioner was Grant's father. The petitioner paid more than $20,000 for day care, schooling and support of Grant. He also added Grant's name to his own $6500 certificate of deposit.

On July 14, 1992, however, the relationship between the petitioner and Donna broke down, and she terminated his visitation with Grant. Thereafter, the petitioner filed a paternity action in Probate Court, seeking to be declared Grant's father.[9] The Probate Court, however, determined that it had no jurisdiction over the matter. Concluding that General Statutes § 46b-172a[10]

[8] Photographs of the petitioner, Donna and Grant on some of the trips were introduced into evidence in the trial court.

[9] Earlier, the petitioner had filed a similar action in Superior Court. Apparently concluding, however, that General Statutes § 46b-172a allowed him to file such an action only in the Probate Court, the petitioner withdrew his Superior Court action on July 13, 1992. See *Weidenbacher* v. *Duclos*, 34 Conn. App. 129, 131, 640 A.2d 147 (1994). The petitioner also moved to intervene as a third party in the Duclos dissolution action, which had gone to judgment two years earlier, on November 14, 1990. The petitioner withdrew that motion to intervene on November 30, 1992.

[10] General Statutes § 46b-172a provides: "(a) Any person claiming to be the father of a child born out of wedlock may at any time but no later than sixty days after the date of notice under section 45a-716, file a claim for paternity with the court of probate for the district in which either the mother or the child resides, on forms provided by such court. The claim shall contain the claimant's name and address, the name and last-known address of the mother and the month and year of the birth or expected birth of the child. Within five days after the filing of a claim for paternity, the judge of the court of probate shall cause a certified copy of such claim to be mailed by certified mail to (1) the vital records section of the department of public health and addiction services and (2) to the mother or prospective mother

limited the class of people who could file a paternity claim to " 'any person claiming to be the father of a child born out of wedlock,' " and further concluding

of such child at the last-known address shown on the claim for paternity. The claim for paternity shall be admissible in any action for paternity under section 46b-160, and shall estop the claimant from denying his paternity of such child and shall contain language that he acknowledges liability for contribution to the support and education of the child after its birth and for contribution to the pregnancy-related medical expenses of the mother.

"(b) If a claim for paternity is filed by the father of any minor child born out of wedlock, the court of probate shall schedule a hearing on such claim, send notice of the hearing to all parties involved and proceed accordingly.

"(c) The child shall be made a party to the action. Said child shall be represented by a guardian ad litem appointed by the court in accordance with section 45a-708. Payment shall be made in accordance with such section from the Probate Court Administration Fund.

"(d) In the event that the mother or the claimant father is a minor, the court shall appoint a guardian ad litem to represent him or her in accordance with the provisions of section 45a-708. Payment shall be made in accordance with said section from the Probate Court Administration Fund.

"(e) Upon the motion of the putative father, the mother, or his or her counsel, or the judge of probate having jurisdiction over such application, filed not later than three days prior to any hearing scheduled on such claim, the probate court administrator shall appoint a three-judge court from among the several judges of probate to hear such claim. Such three-judge court shall consist of at least one judge who is an attorney-at-law admitted to practice in this state. The judge of the court of probate having jurisdiction over such application under the provisions of this section shall be a member, provided such judge may disqualify himself in which case all three members of such court shall be appointed by the probate court administrator. Such three-judge court when convened shall have all the powers and duties set forth under sections 17a-75 to 17a-83, inclusive, 17a-450 to 17a-484, inclusive, 17a-495 to 17a-528, inclusive, 17a-540 to 17a-550, inclusive, 17a-560 to 17a-576, inclusive, and 17a-615 to 17a-618, inclusive, and shall be subject to all of the provisions of law as if it were a single-judge court. The judges of such court shall designate a chief judge from among their members. All records for any case before the three-judge court shall be maintained in the court of probate having jurisdiction over the matter as if the three-judge court had not been appointed.

"(f) By filing a claim under this section, the putative father submits to the jurisdiction of the court of probate, and waives his right to a jury trial.

"(g) Once alleged parental rights of the father have been adjudicated in his favor under subsection (b) of this section, or acknowledged as provided for under section 46b-172, his rights and responsibilities shall be equivalent to those of the mother, including those rights defined under section

that Grant "was *not* born out of wedlock" (emphasis in original), the Probate Court dismissed the petitioner's claim on October 14, 1992.[11]

45a-606. Thereafter, disputes involving custody, visitation or support shall be transferred to the superior court under chapter 815j, except that the probate court may enter a temporary order for custody, visitation or support until an order is entered by the superior court.

"(h) Failing perfection of parental rights as prescribed by this section, any person claiming to be the father of a child born out of wedlock (1) who has not been adjudicated the father of such child by a court of competent jurisdiction, or (2) who has not acknowledged in writing that he is the father of such child, or (3) who has not contributed regularly to the support of such child or (4) whose name does not appear on the birth certificate shall cease to be a legal party in interest in any proceeding concerning the custody or welfare of the child, including but not limited to guardianship and adoption, unless he has shown a reasonable degree of interest, concern or responsibility for the child's welfare.

"(i) Notwithstanding the provisions of this section, after the death of the father of a child born out of wedlock, a party deemed by the court to have a sufficient interest may file a claim for paternity on behalf of such father with the probate court for the district in which either the putative father resided or the party filing the claim resides. If a claim for paternity is filed pursuant to this subsection, the court of probate shall schedule a hearing on such claim, send notice of the hearing to all parties involved and proceed accordingly."

[11] We do not decide in this appeal whether the Probate Court was correct in concluding that Grant was not "a child born out of wedlock" for purposes of § 46b-172a. We therefore express no opinion as to whether "born out of wedlock," as that phrase appears in § 46b-172a, means only that the child's mother and biological father were not married to each other. See 22 H.R. Proc., Pt. 23, 1979 Sess., p. 8117, remarks of Representative Richard D. Tulisano (noting that bill would primarily protect "rights of the unwed father"); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 1979 Sess., p. 1517, remarks of Angela Grant, staff attorney for the Connecticut law revision commission (noting that when a child is born "in wedlock," "it's much simpler to know who the parents are"); id., p. 1522, remarks of Probate Court administrator Glenn Knierim (indicating that this bill addressed "[putative] father's rights"); see also *Johnson* v. *Studley-Preston*, 119 Idaho 1055, 1058, 812 P.2d 1216 (1991) ("[m]any jurisdictions have interpreted the phrase 'child born out of wedlock' to mean either a child born to an unmarried mother *or* a child born to a married woman but fathered by a man other than the mother's husband" [emphasis in original]); *In re Legitimation of Locklear*, 314 N.C. 412, 418, 334 S.E.2d 46 (1985) ("Our research indicates that the phrase, 'born out of wedlock,' should refer 'to

The petitioner thereafter brought this petition for a writ of habeas corpus in the trial court. The trial court, however, concluded that the petitioner lacked standing to pursue his claim. Citing that section of the second edition of American Jurisprudence entitled "Bastards,"[12] the trial court concluded that allowing the petitioner "to bring the present action would be contrary to the strong public policy interest in protecting a minor child from the effects of illegitimacy, and in protecting the integrity of family relationships."[13] The trial court consequently dismissed the action,[14] and the petitioner appealed to the Appellate Court.

The Appellate Court affirmed the decision of the trial court, but on different grounds. Rather than focusing on the public policy ramifications of allowing the petitioner to contest the paternity of the child, as the trial court had done, the Appellate Court looked to the statutory scheme pertaining to paternity claims. After surveying these statutes, the Appellate Court determined that "[t]his state does not have a statute that authorizes an outsider to a marriage to initiate proceedings

the status of the parents of the child in relation to each other.' . . . A child born to a married woman, but begotten by one other than her husband, is a child born out of wedlock'. . . ." [Citation omitted; internal quotation marks omitted.]).

[12] See 10 Am. Jur. 2d 850, Bastards § 10 (1963).

[13] The trial court relied on a Superior Court case, *Forestiere* v. *Doyle*, 30 Conn. Sup. 284, 286, 310 A.2d 607 (1973), for the proposition that, to have standing, the petitioner needed to have "a special interest" and "that the essential elements of such interest are parenthood, cohabitation and support." The trial court did not consider whether *Pi* v. *Delta*, 175 Conn. 527, 400 A.2d 709 (1978), cast doubt on the holding in *Forestiere*. See *Pi* v. *Delta*, supra, 531 (noting that recent trends in the law do "not compel us to affirm the action of the trial court in the present case by concluding that standing is acquired only when a period of cohabitation and support is alleged in conjunction with the allegation of fatherhood").

[14] The trial court noted that the petitioner could seek visitation rights with Grant pursuant to General Statutes § 46b-59, which allows "any person" to seek visitation. The petitioner filed such an action on May 19, 1993, and that action is pending in the Superior Court.

to establish his paternity of a child born during that marriage." *Weidenbacher* v. *Duclos*, 34 Conn. App. 129, 137, 640 A.2d 147 (1994).[15] Apparently deciding that the absence of such a statute was dispositive of the petitioner's claim, the Appellate Court concluded that "[t]he petitioner's interest in establishing his paternity of a child born during wedlock is not one that is protected by the statutes or case law of this state." Id. The court held, therefore, that the petitioner lacked standing to pursue his claim. Accordingly, the Appellate Court affirmed the trial court's dismissal of his habeas corpus petition. We reverse the judgment of the Appellate Court.

I

It is well settled in Connecticut law that a petition for a writ of habeas corpus is a proper procedural vehicle with which to challenge the custody of a child.[16] As early as 1796, this court considered the merits of a habeas corpus petition brought by a father who sought custody of his daughter, who was living with her mother and grandfather. See *Nickols* v. *Giles*, 2 Root (Conn.) 461, 461–62 (1796). In 1822, Chief Justice Zephaniah Swift wrote that "[w]here a wife is wrongfully detained from her husband, *children from their parents*, wards from their guardians, and servants from their masters,

---

[15] The Appellate Court also noted that the petitioner had failed to allege that he had played a significant part in the raising of the child or that the present custodian, Donna Duclos, was unfit. *Weidenbacher* v. *Duclos*, supra, 34 Conn. App. 135. As we indicate in the text of this opinion, we do not consider any of these factors to be dispositive of the petitioner's claim.

[16] General Statutes § 52-466 (f), which furnishes the procedural mechanism for a party to apply for a writ of habeas corpus, provides: "A foster parent or an approved adoptive parent shall have standing to make application for a writ of habeas corpus regarding the custody of a child currently or recently in his care for a continuous period of not less than ninety days in the case of a child under three years of age at the time of such application and not less than one hundred eighty days in the case of any other child."

their restoration may be obtained by this writ . . . ." (Emphasis added.) 1 Z. Swift, A Digest of the Laws of the State of Connecticut (1822) p. 568.[17] This court continues to sanction the use of habeas corpus petitions in child custody cases. See, e.g., *Nye* v. *Marcus*, 198 Conn. 138, 141, 502 A.2d 869 (1985); *McGaffin* v. *Roberts*, 193 Conn. 393, 403, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985); *Pi* v. *Delta*, 175 Conn. 527, 530, 400 A.2d 709 (1978); *Kearney* v. *State*, 174 Conn. 244, 249, 386 A.2d 223 (1978). "A habeas corpus petition concerning a minor child's custody is an equitable proceeding in which the trial court is called upon to decide, in the exercise of its sound discretion, the custodial placement which will be best for the child. *Nye* v. *Marcus*, [supra, 141]; *McGaffin* v. *Roberts*, [supra, 403]." *Evans* v. *Santoro*, 6 Conn. App. 707, 709, 507 A.2d 1007 (1986); see *Doe* v. *Doe*, 163 Conn. 340, 342, 307 A.2d 166 (1972) (habeas relief provides "a means by which the Superior Court may determine what is best for the welfare of the child").

Nevertheless, although the best interests of the child are paramount, we are required, in the first instance, to determine whether the person seeking the equitable remedy of habeas corpus has standing to initiate the action. "Standing focuses on whether a party is the proper party to request adjudication of the issues, rather than on the substantive rights of the aggrieved parties." *Nye* v. *Marcus*, supra, 198 Conn. 141. "It is a basic principle of law that a plaintiff must have stand-

[17] Although not all of these examples hold true today, our current statutes, at least implicitly, recognize the availability of a petition for habeas corpus in child custody matters. General Statutes § 46b-1, which defines "family relations matters," provides that "[m]atters within the jurisdiction of the superior court deemed to be family relations matters shall be matters affecting or involving . . . (8) habeas corpus and other proceedings to determine the custody and visitation of children . . . ." See also General Statutes § 52-466 (f); footnote 16.

ing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. *Ardmare Construction Co.* v. *Freedman,* 191 Conn. 497, 501, 467 A.2d 674 (1983), quoting *Hiland* v. *Ives,* 28 Conn. Sup. 243, 245, 257 A.2d 822 (1966). Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . ." (Citations omitted; internal quotation marks omitted.) *Unisys Corp.* v. *Dept. of Labor,* 220 Conn. 689, 693, 600 A.2d 1019 (1991).

This court, recognizing that courts must be ever mindful of what is in the best interests of a child and of who should be allowed to intrude in the life of a child, has placed limits on the class of persons who have standing to bring a habeas petition for custody. In *Doe* v. *Doe,* supra, 163 Conn. 345, the court held that a person must allege parenthood or legal guardianship of a child born out of wedlock in order to have standing. In *Nye* v. *Marcus,* supra, 198 Conn. 143–44, where foster parents sought custody of their foster child, the

court reiterated that "only parents or legal guardians of a child have standing to seek habeas corpus relief," and explained that "parents" could include either biological or adoptive parents, but not foster parents.[18] The petitioner in this case concedes, in accordance with these precedents, that in order to gain standing to pursue his habeas petition he must allege and prove that he is the biological father of Grant.

The respondents, however, contend that the petitioner cannot prove that he is the father of the child, and therefore cannot satisfy the standing requirements of *Doe* and *Nye*. Adopting the independent rationales of the Appellate Court and the trial court, the respondents contend that two barriers prevent the petitioner from proving his paternity for the purpose of acquiring standing in this case: (1) no Connecticut statute authorizes a putative father to bring an action to establish his paternity of a child who was born in wedlock; and (2) our common law "presumption of legitimacy,"[19] which provides that a child born in wedlock is presumed to be the issue of the mother and her husband, cannot be rebutted by another man who claims to be the child's biological father. Both of these arguments must be rejected.

### A

The respondents initially claim that a putative father can only acquire standing to bring a habeas petition for custody of a child if there is a statutory basis for

---

[18] The legislature, in response to this court's holding in *Nye*, has since enacted a statute that provides certain qualifying foster parents with standing to bring a habeas corpus petition for custody. See General Statutes § 52-466 (f); footnote 16.

[19] See generally note, "The Substantial Relationship Test: The Putative Father Gains Standing to Rebut the Presumption of Legitimacy—*C.C.* v. *A.B.*," 14 W. New Eng. L. Rev. 79 (1992). This presumption also has been referred to as the marital presumption. See generally note, "Rebutting the Marital Presumption: A Developed Relationship Test," 88 Colum. L. Rev. 369 (1988).

an action allowing him to prove paternity.[20] Paternity matters are governed by chapter 815y of the General Statutes. The respondents first contend that § 46b-172a is the only statute within that chapter that might allow a putative father to bring such an action, and, unless the petitioner qualifies under that statute, he cannot prove paternity. The respondents further contend that the petitioner fails to qualify under the terms of that statute. Therefore, according to the respondents, the petitioner cannot establish standing in this case.

We disagree with this analysis. It is true, of course, that chapter 815y sets forth classifications of persons who may bring a statutory cause of action for paternity.[21] It also is true that § 46b-172a sets forth a statutory procedure that enables a putative father to challenge a child's paternity. It does not necessarily follow, however, that unless the petitioner qualifies

[20] Although we refer to this argument as that of the respondents, our comments apply equally to the holding of the Appellate Court, since the respondents have essentially adopted that court's analysis of the issue.

[21] General Statutes § 46b-160 (a), for example, allows the mother of the child to bring such an action. That statute provides in pertinent part: "Proceedings to establish paternity of a child born or conceived out of lawful wedlock, including one born to, or conceived by, a married woman but begotten by a man other than her husband, shall be commenced by the service on the putative father of a verified petition of the mother or expectant mother . . . ." In addition, General Statutes § 46b-162 provides that "[t]he state or any town interested in the support of a child born out of wedlock may, if the mother neglects to bring such petition, institute such proceedings against the person accused of begetting the child, and may take up and pursue any petition commenced by the mother for the maintenance of the child, if she fails to prosecute to final judgment."

A child may also bring such an action. General Statutes § 46b-55 (b) provides: "If any child born during a marriage, which is terminated by a divorce decree or decree of dissolution of marriage, is found not to be issue of such marriage, the child or his representative may bring an action in the superior court to establish the paternity of the child within one year after the date of the judgment of divorce or decree of dissolution of the marriage of his natural mother, notwithstanding the provisions of section 46b-160."

Finally, a husband may disavow paternity of a child during dissolution or divorce proceedings. See General Statutes § 46b-45a.

under the terms of that statute, he cannot demonstrate paternity for purposes of petitioning a court for a common law writ of habeas corpus for custody of a child. Indeed, several considerations convince us otherwise.[22]

First, § 46b-172a (a) provides only that a putative father *"may . . .* file a claim for paternity with the court of probate for the district in which either the mother or the child resides, on forms provided by such court." (Emphasis added.) It does not *require* him to undertake this procedure, at the exclusion of all other procedures, in order to establish his paternity. The legislature has demonstrated on several occasions that it knows how to construct such exclusive statutory schemes. See, e.g., General Statutes § 31-284 (a) ("[a]ll rights and claims between employer and employees . . . are abolished other than rights and claims given by [the Workers' Compensation Act]"); General Statutes § 7-474 (e) ("[t]he procedure for the making of an agreement between the municipal employer and an employee organization provided by said sections shall be the exclusive method for making a valid agreement"); General Statutes § 33-454a (g) ("[t]he rights and remedies provided in this section [for indemnification of corporation members] shall be exclusive"). We deem the legislature's failure to do so in this instance, therefore, to be the product of a conscious and deliberate choice not to create an exclusive statutory means of proving paternity.

Second, and perhaps more importantly, the language of § 46b-172a expressly contemplates that a putative father may use different procedural vehicles to establish his paternity of a child. Subsection (h) states: *"Failing perfection of parental rights as prescribed by this section,* any person claiming to be the father of a child

---

[22] Because we find fault with the first contention of the respondents, we do not decide whether the petitioner could assert a statutory claim for paternity under § 46b-172a. See footnotes 10 and 11.

born out of wedlock (1) *who has not been adjudicated the father of such child by a court of competent jurisdiction . . .* shall cease to be a legal party in interest in any proceeding concerning the custody or welfare of the child, including but not limited to guardianship and adoption, unless he has shown a reasonable degree of interest, concern or responsibility for the child's welfare." (Emphasis added.)

The reference in subsection (h) to a failure to perfect a father's parental rights *"as prescribed by [§ 46b-172a]"* clearly recognizes that there may be additional means that a putative father can utilize to prove his paternity of a child without resort to the statutory means for doing so. Indeed, the first nonstatutory method enumerated by this subsection is an adjudication of paternity by a court of competent jurisdiction. Furthermore, the final clause of the section—"unless he has shown a reasonable degree of interest, concern or responsibility for the child's welfare"—indicates that the failure of a person to prove paternity under the terms of the statute is not conclusive of that person's parental rights. See 22 S. Proc., Pt. 16, 1979 Sess., p. 5217, remarks of Senator Nancy L. Johnson ("a man who wishes to establish paternity rights after the [time limit allowed by § 46b-172a has expired] *may do so* but he must also demonstrate a reasonable degree of interest, concern or responsibility for the child's welfare" [emphasis added]).

Third, the legislative history of § 46b-172a is clear that the legislature did not intend this statutory procedure to supplant every other procedural vehicle that a putative father could employ to establish paternity. Representative Richard D. Tulisano, who reported the paternity bill out of the judiciary committee, informed the House of Representatives "that nothing in the act [subsequently codified as § 46b-172a] will preclude the establishment of paternity or parental rights [by] any

other laws available [in] the State of Connecticut. That is to make sure that this is not thought to be the sole way that an individual can claim paternity in the State of Connecticut." 22 H.R. Proc., Pt. 23, 1979 Sess., p. 8114.[23] Likewise, Senator Alfred Santaniello, Jr., informed the Senate that the statute "would *further* establish the proceedings of paternity claims," rather than replacing existing methods. (Emphasis added.) 22 S. Proc., Pt. 16, 1979 Sess., p. 5217.

Finally, a conclusion that the paternity statutes exclusively determine who may seek a writ of habeas corpus for custody of a child could serve to undermine the peculiarly equitable nature of that writ. In a habeas action for child custody, "[t]he jurisdiction exercised by the court rests on its inherent equitable powers and exerts the force of the state, as parens patria[e], for the protection of its infant ward. *LaBella* v. *LaBella*, 134 Conn. 312, 316, 57 A.2d 627 [1948]. *Howarth* v. *Northcott*, [152 Conn. 460, 464–65, 208 A.2d 540 (1965), overruled on other grounds, *Hao Thi Popp* v. *Lucas*, 182 Conn. 545, 438 A.2d 755 (1980)]; *Doe* v. *Doe*, supra, [163 Conn.] 342–43." (Internal quotation marks omitted.) *Pi* v. *Delta*, supra, 175 Conn. 530. The remedial scope and purpose of the writ of habeas corpus, which has historically been used as a means of litigating cus-

---

[23] Representative Tulisano was referring specifically to a proposed amendment to the bill that read: "Nothing in this act shall preclude the establishment of paternity or parental rights through other means available under the laws of this state." 22 H.R. Proc., Pt. 23, 1979 Sess., p. 8116. This amendment was passed unanimously by the House of Representatives. Id., p. 8122. The language of the amendment ultimately was replaced by the language that now appears in § 46b-172a (h), which we have quoted in the text of this opinion. Representative Tulisano explained that the addition of the new subsection, which specifically refers to other, nonstatutory means of ascertaining paternity, including adjudications by courts of competent jurisdiction, made the previous amendment "somewhat superfluous and not needed." 22 H.R. Proc., Pt. 35, 1979 Sess., pp. 12453–54. We interpret these remarks as indicating that the new subsection (h) embodies the intention of the legislature that § 46b-172a is not the sole means of proving paternity.

tody issues, would not be served by requiring compliance with the formalities embodied in the statutory method of proving paternity.

The Massachusetts Supreme Judicial Court reached a similar result in *C.C.* v. *A.B.*, 406 Mass. 679, 550 N.E.2d 365 (1990). In that case, the putative father brought an action in the Probate Court to adjudicate his paternity and to maintain a relationship with his child. Id., 680–81. The child's mother moved to dismiss the action, contending that because the child had been born in wedlock, the putative father did not meet the statutory qualifications for bringing such an action. Id., 680. The Supreme Judicial Court pointed out, however, that the Probate Court always retained "general equity jurisdiction," and that, "[i]n our view, [the statute] does not abrogate or modify a putative father's right, as established by prior cases of this court, to bring a complaint to establish paternity under the general equity jurisdiction of the Probate Court." Id., 682.

Like the Massachusetts Supreme Judicial Court, we conclude that the statutory scheme pertaining to paternity actions, and specifically § 46b-172a, does not foreclose the Superior Court's jurisdiction to determine whether a putative father is, in fact, the biological father of a child. Accordingly, we conclude that the statutory procedures do not pose a barrier to the petitioner's habeas corpus action for the custody of the child.

B

The respondents argue in the alternative, however, that even if the statutory scheme is not a barrier to the petitioner's action, longstanding precedent of this court prevents the petitioner from taking steps to establish his paternity of the child. They contend that Connecticut has long adhered to a "presumption of legitimacy," which postulates that a child born in wedlock is pre-

sumed to be a legitimate child of the mother and her husband. As against a claim of paternity brought by a putative father of a child born in wedlock, the respondents argue, this presumption becomes irrebuttable and functions as a substantive and conclusive rule of law. We disagree.

It is true, as the respondents point out, that Connecticut law has long provided that a child born in wedlock is presumed to be the legitimate child of the mother and her husband, even if conceived prior to the marriage. This court has applied this principle in cases dating back to at least the beginning of this century. See *Grant* v. *Stimpson*, 79 Conn. 617, 623, 66 A. 166 (1907) ("the law presumes that having been born in lawful wedlock she is his child"). More recent cases have continued to apply this rule. See, e.g., *Holland* v. *Holland*, 188 Conn. 354, 357, 449 A.2d 1010 (1982); *Schaffer* v. *Schaffer*, 187 Conn. 224, 226, 445 A.2d 589 (1982).

We have never held, however, that this presumption is irrebuttable and conclusive against a person claiming to be the biological father of the child. On the contrary, we have held that this presumption may be rebutted by a person who presents clear, convincing and satisfactory evidence that the mother's husband is not the child's natural father. See, e.g., *Holland* v. *Holland*, supra, 188 Conn. 357 (husband challenged own paternity); *Schaffer* v. *Schaffer*, supra, 187 Conn. 226 (same). Indeed, we have not limited or restricted in any way the class of persons who may present such proof and thereby overcome the presumption.

Nevertheless, the respondents contend that the trial court was correct in concluding that this presumption of legitimacy cannot be rebutted by one who claims to be the child's biological father. The respondents argue that important public policy considerations, such as the "strong state interest in protecting the integrity of

the family" and protection of the child's status and reputation, compel this conclusion. We recognize that courts in other jurisdictions historically have taken this approach, which "mechanically den[ies] biological fathers standing to assert paternity whenever a marital presumption of paternity already exists." Note, "Sex, Lies and Genetic Tests: Challenging the Marital Presumption of Paternity Under the Minnesota Parentage Act," 78 Minn. L. Rev. 1013, 1020 (1994); see, e.g., *Ex Parte Presse*, 554 So. 2d 406, 411 (Ala. 1989); *B.H.* v. *K.D.*, 506 N.W.2d 368, 375 (N.D. 1993). In effect, however, the respondents invite this court to take this position for the first time, thereby establishing a new rule of law in Connecticut. For several reasons, we decline to do so.

The reasons for which the irrebuttable quality of this presumption originally sprang into existence do not justify its application today. "Primarily, two factors motivated its adoption. First, the harsh treatment of illegitimate children motivated the state to avoid attaching illegitimate status to children. Second, the lack of a scientifically reliable method of determining paternity was a logical reason for presuming the husband's paternity." Note, "The Substantial Relationship Test: The Putative Father Gains Standing to Rebut the Presumption of Legitimacy—*C.C.* v. *A.B.*," 14 W. New Eng. L. Rev. 79, 80–81 (1992). Today, however, "[s]ociety has come to recognize that discrimination against illegitimate children is not justified." *C.C.* v. *A.B.*, supra, 406 Mass. 685. The social stigma of being branded illegitimate, if indeed it remains at all, no longer carries the same sting that it once did. The United States Supreme Court, moreover, has held that illegitimate children cannot be denied equal protection of the law. *Trimble* v. *Gordon*, 430 U.S. 762, 776, 97 S. Ct. 1459, 52 L. Ed. 2d 31 (1977) (holding unconstitutional intestacy statute that permitted child born out

of wedlock to inherit only from his or her mother).[24] Furthermore, modern scientific tests can determine, with nearly perfect accuracy, who is the true biological father of a child. *Palomba* v. *Gray*, 208 Conn. 21, 36–37, 543 A.2d 1331 (1988) (*Shea, J.*, concurring) ("[t]he use of these new techniques has raised to such a high level the ability of the scientific community to identify the father of a child whose paternity is disputed that the resolution of such an important issue should no longer be had without such scientific testimony").[25] The original reasons which justified the adoption of the rule are no longer valid.

Moreover, although the respondents also contend that the integrity of the family unit requires that a putative father not be allowed to rebut the presumption of

---

[24] Connecticut intestacy statutes do not discriminate between children born in wedlock or out of wedlock. General Statutes § 45a-438 (b) (2) provides in pertinent part: "A child born out of wedlock shall inherit from (A) his or her mother and (B) his or her father, provided (i) such father has been adjudicated the father of such child by a court of competent jurisdiction, or (ii) the father has acknowledged under oath in writing to be the father of such child, or (iii) paternity is established by the probate court, after the death of either the father or the child, by clear and convincing evidence that the father has acknowledged in writing that he is the father of the child and has openly treated the child as his." Section 45a-438 (c) further provides that "[f]or the purposes of this section (1) issue shall include children born out of wedlock and the issue of such children provided both the child born out of wedlock and any of such issue qualify for inheritance under this section; (2) legal representatives shall include legal representatives of children born out of wedlock, provided both the child born out of wedlock through whom such legal representatives inherit and the legal representatives qualify for inheritance under this section."

[25] One type of blood test, the human leukocyte antigen (HLA) tissue typing test, can determine paternity with a rate of 98 percent probability. Fingerprinting with deoxyribonucleic acid, or DNA, can positively identify a person's father. Note, supra, 75 Minn. L. Rev. 1015 n.12. Several Connecticut paternity cases have focused on the accuracy of these tests. See generally *State* v. *Skipper*, 228 Conn. 610, 637 A.2d 1101 (1994) (HLA and DNA tests); *Miller* v. *Kirshner*, 225 Conn. 185, 621 A.2d 1326 (1993) (HLA tests); *Moore* v. *McNamara*, 201 Conn. 16, 513 A.2d 660 (1986) (HLA tests). General Statutes § 46b-168 (a) allows a court or family support magistrate to order DNA tests when the paternity of a child is in issue.

legitimacy, we cannot say that in all circumstances this interest inevitably will outweigh the right of a biological father to maintain a relationship with his child. This case presents the perfect example. The mother, Donna, was living with the petitioner at the time she became pregnant with Grant. She was nine months pregnant at the time she married Edward Duclos. We may assume that Edward Duclos knew at the time he married Donna that he was not the biological father of her child. The marriage of Edward and Donna Duclos is now dissolved. In regard to the relationship between these two individuals, therefore, there is no "family integrity" left to be maintained. On the other side of the coin, however, the petitioner alleges that he is the natural father of Grant, has spent vacations and long weekends with Grant, and has expended a significant amount of his resources for Grant's support. Obviously, cases do exist in which the interest in "family integrity" must yield to a man's interest in maintaining a relationship with the person he believes to be his child. A blanket rule that holds that in all cases the interest of the former must defeat the interest of the latter, therefore, is untenable. More importantly, such an irrebuttable presumption may in any given case be contrary to the well-being of the child, whose best interests might be served by allowing him to experience the love and companionship of his biological father.

Furthermore, in a case such as this, a biological father has a cognizable constitutional right to maintain a relationship with his child. The United States Supreme Court has recognized that "[t]he private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see also *Lehr* v. *Robertson*, 463 U.S. 248, 261, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983) (holding

that unwed father who demonstrates "a full commitment to the responsibility of parenthood," by coming forward to participate in child's rearing, has substantive due process interest in personal contact with child). Although the United States Supreme Court also has held that an irrebuttable presumption of legitimacy does not offend the United States constitution; *Michael H.* v. *Gerald D.*, 491 U.S. 110, 130, 109 S. Ct. 2333, 105 L. Ed. 2d 91 (1989); our respect for this constitutional right discourages us from adopting a rule that precludes a putative father, in any and all circumstances, from proving his paternity of a child. Indeed, to hold that a putative father's right to maintain a relationship with his child must hinge solely on the mother's marital status would be to "differentiate solely on the basis of formal ties." Note, "Rebutting the Marital Presumption: A Developed Relationship Test," 88 Colum. L. Rev. 369, 375 (1988).

Finally, other jurisdictions have moved away from the irrebuttable presumption of paternity. Approximately two-thirds of the states, either by statute or by judicial interpretation, now give putative fathers a right to rebut the presumption that a child born in wedlock is the issue of the marriage. Id., pp. 373–74; see, e.g., Colo. Rev. Stat. § 13-25-126 (1) (e) (IV) (Cum. Sup. 1994); Del. Code Ann. tit. 13, § 805 (a) (Sup. 1994); Mont. Code Ann. § 40-6-107 (1) (1993); *Ban* v. *Quigley*, 168 Ariz. 196, 199, 812 P.2d 1014 (1990), rev. dismissed, 169 Ariz. 477, 820 P.2d 643 (1991); *C.C.* v. *A.B.*, supra, 406 Mass. 686; *McDaniels* v. *Carlson*, 108 Wash. 2d 299, 312, 738 P.2d 254 (1987).

In sum, there is no persuasive reason today to deny the putative father of a child born in wedlock the opportunity to rebut the presumption of legitimacy. Accordingly, we hold that the mere fact that a child was born while the mother was married is not a per se bar that prevents a man other than her husband from establish-

ing standing to bring an action for a writ of habeas corpus for custody of or visitation with a minor child.

## II

Our holding that the presumption of legitimacy may in certain instances be rebutted by a putative father does not end our analysis of the standing issue. Ordinarily, a person establishes standing merely by *alleging* that he has been injured or that he possesses "arguably" protected interests. *Connecticut Assn. of Boards of Education, Inc.* v. *Shedd,* 197 Conn. 554, 557 n.1, 499 A.2d 797 (1985). In actions that call into question the paternity of a child born in wedlock, however, this minimal threshold is inappropriate. Such a standard "could become a blanket license for any person to disrupt long-fostered family relationships by claiming to be the parent of a child." *McDaniels* v. *Carlson,* supra, 108 Wash. 2d 310. A putative father, therefore, must demonstrate something more before he can acquire standing to rebut the presumption of legitimacy of a child born in wedlock.

Courts in other states that have considered this issue have taken two approaches. Under the first approach, which has been embraced most notably by courts in Washington, Kansas and Arizona, the trial court focuses primarily on *the child* and the child's best interests in determining whether to allow the action to proceed. "[T]he court must balance the interests of all parties involved, while keeping in mind that the child's interests are paramount." Id., 312; see *Ban* v. *Quigley,* supra, 168 Ariz. 199; *In re Marriage of Ross,* 245 Kan. 591, 602, 783 P.2d 331 (1989). "In determining whether it is in the child's best interests to allow a paternity action by one outside the present family, the trial court should consider the stability of the present home environment, the existence or lack thereof of an ongoing family unit, the extent to which uncertainty of par-

entage already exists in the child's mind, and any other factors which may be relevant in assessing the potential benefit or detriment to the child. . . . A court must reach this conclusion independently based on the facts in the record and the recommendations of the guardian ad litem appointed to represent the interests of the child." *McDaniels* v. *Carlson, supra,* 108 Wash. 2d 312–13.

Under the second approach, which has been embraced most notably by the Massachusetts Supreme Judicial Court, the court must focus primarily on *the putative father* and whether he has developed a "substantial parent-child relationship" with the child. "The court must look at the relationship as a whole and consider emotional bonds, economic support, custody of the child, the extent of personal association, the commitment of the putative father to attending the child's needs, the consistency of the putative father's expressed interest, the child's name, the names listed on the birth certificate, and any other factors which bear on the nature of the alleged parent-child relationship." *C.C.* v. *A.B., supra,* 406 Mass. 690.

We recognize that each of these tests reflects a judicial attempt to strike a careful balance between the significant, and sometimes competing, interests of the child, the child's family and the putative father. We are mindful, for example, of the strong interests that remain even today in preserving the legitimacy of the child. Similarly, we acknowledge the importance of preserving the integrity of the family unit and the right of privacy of both the child and other family members. Further, we are respectful of the biological father's right to have contact with his child.

Nevertheless, we are reluctant to adopt either of these approaches to the exclusion of the other, or to attempt to formulate our own definitive list of the ele-

ments that will establish legal standing in such a case. Every paternity action revolves around its own unique set of facts and personal relationships, and a trial court must have flexibility to weigh the multiplicity of competing interests that may hang in the balance. This is particularly true in paternity actions that call into question the paternity of a child who was born in wedlock. Such sensitive and personal affairs are no place for an immutable legal standard that is bordered by bright lines. Indeed, we have recognized that it is preferable to leave "the delicate and difficult process of fact-finding in family matters to flexible, individualized adjudication of the particular facts of each case without the constraint of objective guidelines." *Seymour* v. *Seymour*, 180 Conn. 705, 710, 433 A.2d 1005 (1980). Whether a putative father has a special interest sufficient to enable him to bring a paternity action "is, in its nature, a fact-based question." *C.C.* v. *A.B.*, supra, 406 Mass. 690. "Not all putative fathers and not all families are similarly situated; thus their . . . interests cannot be protected by a blanket [rule of law] that treats all putative fathers alike." Note, supra, 88 Colum. L. Rev. 375.

Accordingly, we conclude that a man's mere assertion that he is the biological father, without more, is insufficient to confer standing to challenge the paternity of a child born in wedlock. Rather, we hold that a putative father of such a child must offer proof, at a preliminary evidentiary hearing devoted to standing, that he is entitled to set in motion the judicial machinery to determine whether he is the biological father of the child. This proof may include evidence of any of the factors enumerated in the two approaches discussed above, or of any other factors not so enumerated that are nevertheless relevant to his claim. In deciding whether the putative father has standing, the trial court, on the basis of all the evidence before it, must

determine whether the putative father has established that his interests and the best interests of the child outweigh those of the marital family unit.

We conclude that under this test, the petitioner in this case has established standing to proceed. According to uncontroverted evidence introduced before the trial court, the petitioner was living with Donna Duclos at the time the child, Grant, was conceived. Donna was not married to Edward Duclos at this time, and in fact only married him two weeks before she gave birth. Donna, Grant and the petitioner maintained a significant relationship beginning shortly after Grant's birth and continuing for several years, and including several vacations in which the three traveled together, until Donna unilaterally terminated the petitioner's visitation rights. Grant apparently knows the petitioner in the role of a parent, calling him "Dad," and the petitioner has expended substantial amounts of money on Grant. Finally, the marriage of Donna and Edward Duclos is now dissolved.[26] This evidence is more than sufficient to confer standing on the petitioner to pursue his habeas claim.[27]

---

[26] The respondents also argue that because the petitioner was aware of the dissolution action between the respondents, and because the dissolution decree included a finding that Grant was the issue of the marriage, the petitioner now is collaterally estopped from claiming that he is Grant's biological father. The Washington Supreme Court rejected such a claim on the basis of similar facts in *McDaniels* v. *Carlson*, supra, 108 Wash. 2d 299. "The issue of paternity was never actually litigated in the dissolution proceedings; it was merely presumed upon the parties' stipulations. Moreover, paternity was only collateral to the real issues in controversy: custody, support, and visitation rights. Therefore, there was no identity of issues between the paternity finding in the prior dissolution case and the present cause of action. . . . [The putative father] did not testify as a witness or participate whatsoever in the dissolution case. Furthermore, the facts do not establish that [the] appellant was fully aware of the character of the dissolution proceeding, i.e., that it would result in a conclusive paternity determination." Id., 306–307. For these same reasons, we find that this claim of the respondents is without merit.

[27] We stress, however, that not every putative father must present this quantity or type of evidence in order for the trial court to conclude that he has standing to pursue his paternity claim.

## III

We emphasize that we do not take any position with respect to the fitness of the petitioner to gain custody of, or to obtain visitation with, the child. We hold only that the petitioner has standing to pursue his habeas corpus action for this purpose. In accordance with our precedents, the petitioner has a twofold task ahead. First, he must prove, by clear and convincing evidence, that he is the biological father of Grant. Second, the petitioner must prove to the trial court that it is in the best interests of Grant that he be awarded custody or visitation. "The trial court's ultimate decision whether to grant relief sought by the [petitioner] must be made only after a careful evaluation of all the relevant evidence presented and with primary concern for the welfare of the [child] involved." *Pi* v. *Delta*, supra, 175 Conn. 534. "What is best for the welfare of the child is still the ultimate question to be decided by the trial court." *Doe* v. *Doe*, supra, 163 Conn. 345.

The judgment of the Appellate Court is reversed, and the case is remanded to that court with direction to remand to the trial court for proceedings consistent with the previous paragraph of this opinion.

In this opinion the other justices concurred.