**In re ESTATE OF Anna Mae ARMSTRONG.**

**C. Ray ADAMS, Administrator, Plaintiff–Appellee,**

v.

**Velma MANIS, et al., Defendants–Appellants.**

Court of Appeals of Tennessee, Eastern Section.

Feb. 25, 1993.

Permission to Appeal Denied by Supreme Court June 1, 1993.

**324**

Thomas F. Bloom, Nashville, for appellants.

Gary E. Brewer and Steven W. Terry, Morristown, Jack H. Burkhard and Judy S. Robinson, Greeneville, for appellee Ella Mae Norton.

## OPINION

SANDERS, Presiding Judge, Eastern Section.

Some 29 collateral kinsmen and kinswomen have appealed from a declaratory judgment declaring Defendant–Appellee Ella Mae Boyd Norton to be the half sister and heir at law of Anna Mae Armstrong, deceased.

Anna Mae Armstrong died intestate in Greene County in October, 1989, at the age of 80 years. Mrs. Armstrong had no children and her husband predeceased her. It was originally thought by Plaintiff C. Ray Adams, administrator of the estate, that the 29 distant relatives named in the complaint were the heirs at law of Mrs. Armstrong. Prior to making distribution of the assets of the estate, however, the administrator learned the Defendant–Appellee, Ella Mae Boyd Norton, who was a resident of Greene County, was reputed to be the half sister of Mrs. Armstrong. The administrator filed a declaratory judgment action in the chancery court, naming the 29 distant relatives of Mrs. Armstrong and Ella Mae Boyd Norton, together with unknown relatives of Anna Mae Armstrong, as defendants. He asked the court to make a determination of the interest, if any, of the named defendants and any unknown persons in the estate of Anna Mae Armstrong.

Upon the trial of the case, the court determined that Clyde Wells, the natural father of Anna Mae Armstrong, deceased, was also the natural father of Ella Mae Boyd Norton and Ella Mae Boyd Norton and Anna Mae Armstrong were half sisters. Accordingly, Ella Mae Boyd Norton was the lawful heir of the estate of Anna Mae Armstrong.

The other Defendants have appealed, presenting the following issue for review: "Whether the alleged half sister of the intestate rebutted the presumption of legitimacy and whether she established her paternity by clear and convincing evidence." We find the answer to both questions in the affirmative and affirm for the reasons hereinafter stated.

Mrs. Armstrong's father, Mr. Clyde Wells, was reputed to also be the father of Ella Mae Boyd Norton (Ella Mae). At the time Ella Mae was conceived, her mother, Alice Boyd, was married to and living with Ella Mae's supposed father, Elmer Boyd, in a tenant house on Clyde Wells's property. Elmer Boyd was an alcoholic and when he had alcohol available he would drink until he passed out. When he woke up, if he still had alcohol available he would drink until he passed out again. Clyde Wells was a frequent visitor at the Boyds' home and frequently furnished Elmer Boyd with moonshine liquor to drink. The relationship between Mr. Wells and Mrs. Boyd was very suspect in the community.

Gladys Wilkerson, who was a neighbor of the Boyds' when Ella Mae was born, testified her husband's mother, Maggie Jane Wilkerson (Grandma), acted in the capacity of a midwife and delivered Ella Mae when she was born. Mrs. Wilkerson was asked, and testified, as follows:

"Q. Did you have a conversation with Grandma, after she had come from delivering Ella Mae?

"A. Well, yes, there was some more there and when they left, later, down in the evening, she just sat down there and said ... she never did talk too much, but she said, 'Well, there's a "nigger" in the wood pile.' I never will forget that, and I said, 'What are you talking about?' and she said, 'Ella Mae don't belong to Elmer.' Now, one of them had to tell her that."

Mrs. Wilkerson further testified she and her husband were neighbors of the Boyds' while Ella Mae was growing up and Elmer was mean to Ella Mae and didn't treat her like his other children. Other neighbors also testified as to Elmer's being mean to Ella Mae and that when he was drinking he would curse her and call her a "bastard."

Ella Mae's youngest sister testified that as she was growing up she slept at the foot of the bed with her father and mother and she would wake up at night when her mother would be crying and her father raping her mother and calling her a whore.

Mr. Frank Cogdill, who lived near the Boyds for several years during the 1940's and '50's, saw Elmer Boyd rather frequently. He worked with Mr. Boyd some and Mr. Boyd did work for him. He apparently was a rather close friend with Mr. Boyd and, particularly when Mr. Boyd was drinking, he apparently talked quite frankly with Mr. Cogdill. Mr. Cogdill testified that on several occasions Mr. Boyd told him Ella Mae was not his child. He testified Mr. Boyd said Ella Mae was Clyde Wells's child. The following are some pertinent excerpts from Mr. Cogdill's testimony:

"Q. Did you see Elmer Boyd on a regular basis? I believe you told us about once a week or so?

"A. Oh, I'd see Elmer once a week or twice or three times a week, when I lived down there next to him. Maybe every day or so."

    \*    \*    \*    \*    \*    \*

"Q. And you say you've seen Mr. Clyde Wells bring liquor over there to Elmer?

"A. Yes, sir, I have.

"Q. How did they get along?

"A. Oh, they'd argue and fuss a little.

"Q. Do you know what they were arguing and fussing about?

"A. Well, I heard them arguing one time and I heard Clyde tell him that Ella Mae wasn't his young'un, it was his young'un. They got in a little argument one time. I heard them saying something about that. I heard Clyde say that.

"Q. You heard Clyde Wells say what, now? I didn't....

"A. Clyde said that Ella Mae was his young'un. That's what I heard him say."

    \*    \*    \*    \*    \*    \*

"Q. Did you overhear ... or were you ever told by Elmer, when he was talking about Ella Mae not being his child, about what John [sic] [Clyde] Wells was doing? You used an expression that's sort of typical of East Tennessee, about shucking corn?

"A. Yeah, well, now, I'll tell you, Elmer wasn't no fool. He knew his corn was getting shucked. Elmer knew that.

"Q. Tell us about the conversation where he said that Clyde Wells was shucking his corn?

"A. Yeah, he said ... he knowed Ella Mae was ... he knowed Ella Mae belonged to Clyde. He knew that all along. That's the reason why Elmer didn't like Ella Mae all that good."

It was also testified that on one occasion when Elmer Boyd stated Ella Mae was Clyde Wells's daughter, Alice Boyd, Ella Mae's mother, was present but she remained silent and did not dispute what Elmer said.

Ella Mae's oldest brother testified that when he was about 11 years old Clyde Wells and his son-in-law, Clyde Armstrong, came to their home and offered them money if his parents would let them take Ella Mae with them.

Anna Mae Armstrong, who was apparently some 25 to 30 years older than Ella Mae, openly proclaimed Ella Mae to be her half sister from the time Ella Mae was a

young child until Anna Mae's death in 1989.

Ella Mae's first memories of Anna Mae were when Anna Mae came to their home and asked her mother, and supposedly her father, to let her and the oldest brother attend the school where Anna Mae was teaching. Ella Mae was approximately 10 years old at that time. Ella Mae started to school where Anna Mae was teaching. A very close relationship developed between them. Anna Mae became very attentive to Ella Mae. She bought her school supplies, clothing, and other things. This relationship continued until Ella Mae was 18 years old, when she married a man whom Anna Mae tried to persuade her not to marry. After Ella Mae's marriage, the closeness of their relationship ceased but Anna Mae continued to proclaim her as her half sister. Anna Mae had received a master's college degree and in later years she expressed regrets to friends that she had not been able to give her half sister the same opportunities in life that she had. Anna Mae's husband, Clyde Armstrong, made reference to Ella Mae as Anna Mae's half sister.

Mr. Marcus Johnson, who farmed the land of Anna Mae Armstrong and her husband for some 12 years before Anna Mae's death and who, with his wife, moved in the home with Mrs. Armstrong and took care of her for a period of time prior to her death, testified he had a close relationship with Mrs. Armstrong and in May, 1987, took Mrs. Armstrong to the office of an attorney in Greeneville to have her will made. He was asked about a conversation he had with Anna Mae after she had made her will. As pertinent here, he testified as follows:

"Q. Tell His Honor what she told you, concerning a sister or half sister?

"A. We was coming back toward Greeneville and she made the statement to me that Papa had done things that he shouldn't and she had a half sister named Ella Mae. She said, 'I have took care of it in my will, in Mr. Terry's office. I have provided for that'.

"Q. And did she make any other statements after that date to you about hav-ing a half sister, or was that the only time?

"A. Right before she passed away, she did make a statement to me that ... said, 'Be sure my half sister is took care of'."

A canceled check was introduced into evidence showing Mrs. Armstrong had written a $30 check to Attorney Charles Terry on May 11, 1987, for "Will." The will, however, was never found after Mrs. Armstrong's death.

A number of photographs of both Anna Mae and Ella Mae were introduced into evidence which show a striking family resemblance.

The chancellor, in his memorandum opinion of the determination of the case, as pertinent here, said: "Much of the evidence presented was circumstantial, as one would expect, and much of it was hearsay evidence admitted through TRE 803(19) and 804(b)(4). Considered as a whole, that evidence, although circumstantial and admittedly hearsay, is not only clear and convincing, it borders on the overwhelming. But if there is one item of evidence that served to remove any real doubt about the claimant's true parentage, that evidence is Exhibits 14 and 11.

"Exhibit 11 is a photograph of the decedent as a young woman. No one undertook to express an opinion regarding the age of the decedent when that photograph was taken, but clearly she was in her mid-twenties or early thirties. Exhibit 14 is a photograph of claimant at age 26. It is not an exaggeration to state that the two photographs could have been of the same woman. The similarities are not merely noticeable, they are striking.

"The Court is of the opinion that the claimant has proven, by clear and convincing evidence, that her father was Clyde Wells and not Elmer Boyd.

"The collateral kindred of decedent raised various legal matters in opposition to claimant's claim, all of which basically amount to estoppel.

"One cannot be estopped from maintaining a claim if, when the actions that gave

rise to the estoppel occurred, the claimant had no knowledge or information regarding the matter currently at issue.

"The same is true with regard to waiver: One cannot wave [sic] a right about which one does not know or have information.

"It is the finding of this Court that Ella Mae Boyd–Norton is the daughter of Clyde Wells and thus the sole heir of Anna Mae Armstrong, her half-sister.

"The collateral heirs also insist that claimant should be barred from asserting that she is the daughter of Clyde Wells, rather than of Elmer Boyd, because there is in the law a presumption of legitimacy and, it follows, a presumption against illegitimacy. *Cannon v. Cannon*, 26 Tenn. 410 (1846). Such presumptions, however, may be rebutted. Having proven by clear and convincing evidence that she is the daughter of Clyde Wells, she has just as successfully rebutted these presumptions."

The landmark case in this jurisdiction holding an illegitimate child may inherit from its father is *Allen v. Harvey*, 568 S.W.2d 829 (Tenn.1978). In its holding, the court concluded as follows:

> The decision we reach today—that a child born out of wedlock may inherit from and through his father—is specifically limited to cases where paternity is established by clear and convincing proof and to cases where rights of inheritance have not finally vested. All cases in conflict with this decision are hereby expressly overruled.

568 S.W.2d 829.

The *Allen* case succeeded the passage in 1977 of T.C.A. § 31–2–105 which, as pertinent here, provides:

> **Parent-child relationship.**—If, for purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person:
>
> \* \* \* \* \* \*
>
> (2) ... a person born out of wedlock is a child of the mother. That person is also a child of the father, if:
>
> \* \* \* \* \* \*

> (B) The paternity is established by an adjudication ... by clear and convincing proof.

■ Appellants, in their brief, make the following statement: "[T]he claimant was not born 'out of wedlock' because her mother was married at the time of her conception and birth and thus Tenn.Code Ann. Section *36*–2–105(2)(B) is not applicable to her. *See, Cunningham v. Golden*, 652 S.W.2d 910 (Tenn.App.1983)." (Emphasis ours.)

We assume the Appellants intended to refer to the statute above instead of T.C.A. *36*. Nevertheless, we think Appellants' reliance on *Cunningham v. Golden*, 652 S.W.2d 910 being supportive of their argument that T.C.A. 31–2–105 is not applicable to the case at bar, is completely misplaced. *Cunningham* only construed the intent of the legislature in its use of the words "not born in lawful wedlock" in its enactment of T.C.A. § 36–2–202, which relates to the filing of a petition to legitimate a child. There is no correlation between T.C.A. § 36–2–202 and T.C.A. § 31–2–105, which relates to the right of an illegitimate child to inherit from its putative father. While T.C.A. § 31–2–105 defines a person "born out of wedlock" for the purpose of applying the statute, had the legislature chosen to define an illegitimate person instead of one born out of wedlock, the end result of the application of the statute would have been the same. Blacks Law Dictionary, Abridged Fifth Edition, defines "born out of wedlock" as "[c]hildren whose parents are not, and have not been, married to each other regardless of marital status of either parent with respect to another. See **Illegitimate**." It also defines an illegitimate child, as pertinent here, as follows: "**Illegitimate child.** Child *who is* born at a time when his parents, though alive, are not married to each other." We find this argument of the Appellants to be without merit.

■ The Appellants argue in their brief that before the Appellee can prevail in the case at bar she has two hurdles she must overcome. First, she must rebut the strong presumption of legitimacy and, second, she must prove the paternity of Clyde

Wells by clear and convincing proof. We agree with this contention of the Appellants. Under the facts in the case at bar, however, the two burdens merge into one.

T.C.A. § 31–2–105 requires the parent-child relationship to be established by "clear and convincing proof." In *Jackson v. Thornton*, 133 Tenn. 36, 39, 179 S.W. 384 (1915) the supreme court held that "in respect of the weight of the evidence required to override the presumption [of legitimacy] clear, strong, and convincing testimony must be adduced by him who alleges illegitimacy." 133 Tenn. at 39, 179 S.W. 384. The *Jackson* case was an affirmation of the much earlier case regarding the presumption of legitimacy of *Cannon v. Cannon*, 26 Tenn. 411 (1846) where the court said: "Although the presumption in favor of legitimacy ... still holds whenever it is not inconsistent with the facts of the case, yet, if such circumstances be in proof as clearly negative the truth of the presumption, the legal intendment will fail." 26 Tenn. 412 (Quoting Lord Coke).

In addressing what constitutes "clear and convincing" evidence, the court, in *Jackson v. Thornton*, 133 Tenn. 36, 179 S.W. 384 (1915) said: "A mere preponderance in his favor is not enough; nor may testimony of mere rumor and suspicion among neighbors touching the true paternity of the child avail to overcome the presumption."

In the more recent case of *Majors v. Smith*, 776 S.W.2d 538 (Tenn.App.1989) this court said:

> [T]he requirements of clear and convincing proof is [sic] not satisfied by circumstances which merely "suggest" or imply parentage, or even support probability. The circumstances must be such as to produce a state of conviction (by convincing) that the desired fact is indeed true.
>
> Of course, the credibility of witness [sic] is an entirely separate question, for the finder of fact must first determine which testimony will be believed and which will not be believed.

776 S.W.2d at 540.

The chancellor in the case at bar apparently believed the Appellee's witnesses; but even if the Appellants' witnesses were also speaking the truth, there is nothing to directly contradict the testimony of Appellee's witnesses. "The existence of a child born out of wedlock is not ordinarily announced with blaring trumpets to all who may hear. More often, it is a private affair, confided only to confidential friends. The fact that others were not told is, if circumstantial at all, a very weak circumstance." *Majors*, 776 S.W.2d at 540–41.

 The Appellant also argues it was error for the chancellor to consider any physical resemblance between the deceased and Ella Mae Norton. The photographs offered by Appellee for this purpose were entered into evidence without objection. Without timely objections, Appellants may not now raise the issue on appeal. *Wright v. United Services Automobile Assn.*, 789 S.W.2d 911, 914 (Tenn.App.1990). ("Failing to make a timely, specific objection in the trial court prevents a litigant from challenging the introduction of inadmissible evidence for the first time on appeal.") Tennessee Rules of Evidence, 103(a)(1).

The finding of fact by the trial court in a case of this nature comes to this court with a presumption of correctness unless the evidence preponderates otherwise. T.R.A.P. Rule 13(d). We find the evidence does not preponderate against the findings of the chancellor, and concur.

The decree of the chancellor is affirmed. The cost of this appeal is taxed to the Appellants and the case is remanded to the trial court for any further necessary proceedings.

FRANKS and McMURRAY, JJ., concur.