# IN THE COURT OF APPEALS OF TENNESSEE
## MIDDLE SECTION AT NASHVILLE

| | | |
|---|---|---|
| MICHAEL SCOTT EVANS, | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | |
| | ) | Davidson Juvenile |
| | ) | No. 9419-13267 |
| VS. | ) | |
| | ) | Appeal No. |
| | ) | 01-A-01-9511-JV-00508 |
| KAREN MARIE BISSON STEELMAN, | ) | |
| | ) | |
| Defendant/Appellee. | ) | |

**FILED**

**October 2, 1996**

**Cecil W. Crowson**
**Appellate Court Clerk**

## DISSENTING OPINION

Michael Scott Evans is seeking nothing more than to acknowledge his parental responsibilities to Jacob Ryan Steelman. The majority, however, has decided that he is not entitled to prove in court that he is the boy's biological father simply because the child's mother was married to another man when he was born. This decision rests squarely on an erroneous judicial interpretation of Tennessee's legitimation statutes. Rather than perpetuating injustice, our responsibility as common law judges is to remedy, not ignore, plain judicial mistakes.

### I.

The facts of this case fall into an all too common pattern. Karen Marie Bisson Steelman married Jamie R. Steelman in July 1993 when she was only eighteen years old. The marriage foundered within six months, and in January 1994 Ms. Steelman left her husband and moved into an apartment with Michael Scott Evans.[1] Ms. Steelman admittedly had sex regularly with Mr. Evans. After discovering that she was pregnant in March 1994, Ms. Steelman openly acknowledged to Mr. Evans and his family as well as to her medical providers and other acquaintances that Mr. Evans was the child's father.

---

[1] Mr. Evans stated in a brief filed in the juvenile court that his relationship with Ms. Steelman began in 1991. The record contains no evidentiary substantiation for this assertion.

Mr. Evans began making preparations for the child with the expectation that he would eventually marry Ms. Steelman. However, his relationship with Ms. Steelman soured in June 1994 apparently because of a dispute over their unborn child. On June 13, 1994, Ms. Steelman wrote Mr. Evans a note stating:

> I have always said that I would never keep our child away from you, but don't you dare think for a second that I would let you take my child from me. Don't even think about trying because you'll be sorry.
>
> Yes I didn't graduate, but that's being taken care of now. Yes I got married at 18 and am getting divorced. I also got beat-up. Yes I am pregnant by a man who is not my husband, but you also got another man's wife pregnant.
>
> I promise you'll be sorry if you try to take my child away. As long as I'm alive you will not have custody of our baby. As long as you don't test that, you will be able to see your child as much as you want.
>
> I can't handle all the stress that you're putting on me, so for our child's sake, please stop.

Ms. Steelman moved out of Mr. Evans's apartment in early July 1994 without telling him where she was going. She telephoned Mr. Evans in August to inform him that she was returning to Mr. Steelman, that the child would not bear his surname, and that she would not list him as the child's father on the birth certificate.

Thereafter, Ms. Steelman kept Mr. Evans in the dark about her pregnancy and the child. On November 24, 1994, Ms. Steelman gave birth to a son named Jacob Ryan Steelman. She listed Mr. Steelman as the father on the child's birth certificate. Mr. Evans found out about the child's birth three days later when the hospital telephoned his residence seeking Ms. Steelman.

When Ms. Steelman rebuffed his efforts to see the child, Mr. Evans hired a lawyer and on December 12, 1994, filed a sworn petition to legitimate the child in the Davidson County Juvenile Court. Mr. Evans made an unconditional offer in the petition to support the child financially and requested the juvenile court to order the parties to submit to blood tests to conclusively establish that he was the child's biological father.

Ms. Steelman vigorously opposed Mr. Evans's legitimation petition just as she threatened she would in her June 13, 1994 note. While she did not deny her six-month sexual liaison with Mr. Evans, she obtained an affidavit from Mr. Steelman asserting that he had also continued to have sex with Ms. Steelman while she was living with Mr. Evans and that he considered himself to be the child's father. She also asserted in her answer and in a later motion to dismiss that Mr. Evans had no standing under Tenn. Code Ann. § 36-2-202 (Supp. 1995) to file a legitimation petition. Her argument rested on this court's construction of Tenn. Code Ann. § 36-2-202(a) in *Cunningham v. Golden,* 652 S.W.2d 910, 913 (Tenn. Ct. App. 1983), *appeal dismissed,* 466 U.S. 966, 104 S. Ct. 2336 (1984), that a child born while its mother was married could not be considered as a "child not born in lawful wedlock" for the purpose of the legitimation statute.

On June 15, 1995, Mr. Evans filed a formal acknowledgment that he was Jacob Ryan Steelman's biological father with the Putative Father Registry maintained by the Department of Human Services in accordance with Tenn. Code Ann. § 36-2-209 (1991 & Supp. 1995). A juvenile court referee and the juvenile court judge later dismissed his petition without ordering blood tests on the ground that he did not have standing under Tenn. Code Ann. § 36-2-202 to legitimate Jacob Ryan Steelman. The majority has decided to affirm. While proclaiming that they might interpret Tenn. Code Ann. § 36-2-202 differently were it not for the *Cunningham v. Golden* decision, they have decided not to consider the question anew because they believe that the legislature has somehow written the *Cunningham v. Golden* decision into the current legitimation statutes.

## II.

The threshold issue is whether the construction of Tenn. Code Ann. § 36-2-202(a) in *Cunningham v. Golden* has become so firmly established that the doctrine of stare decisis places it beyond our consideration at this time. While

adhering to precedent is usually a wise policy, the courts are not constrained to follow precedents that have produced unjust results or are poorly reasoned.

## A.

The common law consists of a vast body of judicial precedents representing the courts' resolution of concrete controversies using workable solutions to control conduct or to define legal relations. These precedents provide the courts with authoritative guidance for their decisions[2] and also enable the bar and the public to predict how the courts will decide future cases.[3] They serve their purpose best when they are consistent and uniform, *State ex rel. Pitts v. Nashville Baseball Club,* 127 Tenn. 292, 303, 154 S.W. 1151, 1154 (1913); *Steedman, Steere & Co. v. Dobbins & Dazey,* 93 Tenn. 397, 406, 24 S.W. 1133, 1135 (1894), and it is this uniformity and consistency that undergirds the public's confidence in the judicial system. *Dupuis v. Hand,* 814 S.W.2d 340, 345 (Tenn. 1991); *Davis v. Davis,* 657 S.W.2d 753, 758 (Tenn. 1983).

Judicial decisions are shaped not only by legal principles and doctrines but also by the decision-making techniques used to develop and apply them.[4] It is the courts' respect for the doctrine of stare decisis that accounts for the uniformity of the precedents and the consistency in the courts' decision-making techniques. As a decision-making technique, the doctrine of stare decisis promotes consistency by requiring adherence to settled principles of law recognized and followed in earlier cases. *Staten v. State,* 191 Tenn. 157, 159, 232 S.W.2d 18, 19 (1950); *Barton's Lessee v. Shall,* 7 Tenn. (Peck) 214, 232 (1823). Thus, stare decisis admonishes courts not to overturn decisions in an arbitrary or cavalier manner. *Ferguson v. Ram Enters., Inc.,* 900 S.W.2d 19, 21 (Tenn. 1995); *State v. Kendricks,* 891 S.W.2d 597, 603 (Tenn. 1994).

---

[2] 2 Roscoe Pound, *Jurisprudence* 166 (1959).

[3] *J.T. Fargason Co. v. Ball,* 128 Tenn. 137, 141, 159 S.W. 221, 222 (1913); O.W. Holmes, *The Path of the Law,* 10 Harv. L. Rev. 457, 460-61 (1897).

[4] Dean Pound explained the relationship between the legal principles and the techniques used to decide cases as follows: "The body of precepts gets its whole life from the technique of developing and applying them; and that technique gets its color and its direction, and the precepts themselves get their shape and content for the time being from the traditional ideas or current professional ideas as to the end of law." 1 Roscoe Pound, *Jurisprudence* 73 (1959).

As important as the doctrine is, stare decisis is not an inexorable command, *Payne v. Tennessee,* 501 U.S. 808, 828, 111 S. Ct. 2597, 2609-10 (1991), or an inflexible, mechanical formula. *City of Memphis v. Overton,* 216 Tenn. 293, 298, 392 S.W.2d 98, 100 (1965). It does not command "mindless obedience" from the courts. *McIntyre v. Balentine,* 833 S.W.2d 52, 56 (Tenn. 1992); *Hanover v. Ruch,* 809 S.W.2d 893, 898 (Tenn. 1991). Prior decisions are not "like the holy ark of the covenant, too sacred to be touched." *Barton's Lessee v. Shall,* 7 Tenn. (Peck) at 232. Since the law should serve the needs of the people, *Dupuis v. Hand,* 814 S.W.2d at 345-46; *Powell v. Hartford Accident & Indem. Co.,* 217 Tenn. 503, 513, 398 S.W.2d 727, 732 (1966), the doctrine of stare decisis should not impede the growth and development of the law. *Hamby v. McDaniel,* 559 S.W.2d 774, 780 (Tenn. 1977); *Shousha v. Matthews Drivurself Serv., Inc.,* 210 Tenn. 384, 389, 358 S.W.2d 471, 473 (1962).

The courts must re-examine prior decisions when the circumstances require. If they cannot distinguish or sidestep a prior decision,[5] they must be prepared to reject and overrule when necessary to protect the interests and rights of the public and to promote respect for the law.[6] The courts should exercise their power sparingly, *Edingbourgh v. Sears, Roebuck & Co.,* 206 Tenn. 660, 664, 337 S.W.2d 13, 14 (1960); *J.T. Fargason Co. v. Ball,* 128 Tenn. at 142, 159 S.W. at 222, and should only disregard a prior decision when the difficulties caused by doing so are outweighed by the problems caused by adhering to the earlier decision. *Lee v. Harris,* 188 Tenn. 373, 376-77, 219 S.W.2d 892, 893 (1949); *Steedman, Steere & Co. v. Dobbins & Dazey,* 93 Tenn. at 406, 24 S.W. at 1135.

The courts must have a compelling reason to overturn a prior decision. *Blue Ridge Ins. Co. v. Haun,* 197 Tenn. 527, 536, 276 S.W.2d 711, 715 (1954); *Barnes v. Walker,* 191 Tenn. 364, 369, 234 S.W.2d 648, 650 (1950). The two most common circumstances warranting the relaxation of the doctrine of stare decisis

---

[5]*Shay v. Harper,* 202 Tenn. 141, 151, 303 S.W.2d 335, 340 (1957) (distinguish prior decisions to avoid injustice); *Griffitts v. Humphrey,* 199 Tenn. 528, 532, 288 S.W.2d 1, 3 (1955) (courts must make a clear distinction when an earlier decision cannot be "sidestepped very gently").

[6]Rigid reliance on the doctrine of stare decisis can confound the truth and foster an attitude of contempt for the law. *McIntyre v. Balentine,* 833 S.W.2d at 56; *Dupuis v. Hand,* 814 S.W.2d at 345; *Hanover v. Ruch,* 809 S.W.2d at 898; *Davis v. Davis,* 657 S.W.2d at 758.

are when the prior precedent has become obsolete because of changes in the law, *Ferguson v. Ram Enters., Inc.,* 900 S.W.2d at 21; *Metropolitan Gov't v. Poe,* 215 Tenn. 53, 80-81, 383 S.W.2d 265, 277 (1964), or when the prior decision has manifestly misunderstood or misapplied the law. *Summers v. Thompson,* 764 S.W.2d 182, 199 (Tenn. 1988) (Drowota, J., concurring); *Foster v. Roberts,* 142 Tenn. 350, 360, 219 S.W. 729, 731 (1920); *Arnold v. Mayor of Knoxville,* 115 Tenn. 195, 202, 90 S.W. 469, 470 (1905); *The Judges' Cases,* 102 Tenn. 509, 542, 53 S.W. 134, 142 (1899).

The doctrine of stare decisis does not apply with full force to principles that have not been directly adopted by the Tennessee Supreme Court. *Swift v. Kirby,* 737 S.W.2d 271, 277 (Tenn. 1987). Lower courts must follow the Tennessee Supreme Court's decisions, *Payne v. Johnson,* 2 Tenn. Cas. (Shannon) 542, 543 (1877); *Haun v. Guaranty Sec. Ins. Co.,* 61 Tenn. App. 137, 158, 453 S.W.2d 84, 94 (1969); *Levitan v. Banniza,* 34 Tenn. App. 176, 185, 236 S.W.2d 90, 95 (1950), but they are not required to adhere as strictly to decisions of courts of coordinate or lesser jurisdiction. While published intermediate appellate court decisions have some precedential value, *Meadows v. State,* 849 S.W.2d 748, 752 (Tenn. 1993), the precedential value of unpublished opinions is somewhat weaker. *Ford v. State,* 184 Tenn. 443, 454, 201 S.W.2d 539, 544 (1947). Thus, intermediate appellate court decisions where no application for permission to appeal has been filed have no stare decisis effect. *Swift v. Kirby,* 737 S.W.2d at 277; *Board of Comm'rs v. Obion County,* 188 Tenn. 666, 669, 222 S.W.2d 7, 8 (1949); *Gotten v. Gotten,* 748 S.W.2d 430, 431 (Tenn. Ct. App. 1987).

**B.**

The Tennessee Supreme Court has never construed the meaning of the phrase "child not born in lawful wedlock" in Tenn. Code Ann. § 36-2-202(a). The first reported judicial construction of this phrase appeared in the *Cunningham v. Golden* decision. This decision has been followed by panels of the Eastern and Western Sections of this court in one published and three unpublished decisions. *Cooper v. Thompson,* 710 S.W.2d 944, 946 (Tenn. Ct. App. 1985); *In re Young (Meadows v. Wells),* App. No. 01-A-01-9409-GS-00417, slip op. at 2-3 (Tenn. Ct.

App. June 30, 1995) (Memorandum Opinion), *perm. app. denied* (Tenn. Oct. 23, 1995); *Frady v. Frady,* C.A. No. 155, slip op. at 3-4 (Tenn. Ct. App. Mar. 18, 1991) (Memorandum Opinion), *perm. app. denied* (Tenn. June 24, 1991); *In re Doss (Doss v. Daily),* C.A. No. 69, slip op. at 2 (Tenn. Ct. App. June 9, 1989) (No Tenn. R. App. P. 11 application filed).

The Tennessee Supreme Court declined to review the *Cunningham v. Golden* decision[7] and three of the four cases following it. These dispositions do not add precedential weight to *Cunningham v. Golden* because the simple denial of an application for permission to appeal does not indicate that the Tennessee Supreme Court agrees with any of the holdings in the decision. *Meadows v. State,* 849 S.W.2d at 752; *Swift v. Kirby,* 737 S.W.2d at 277; *Bryan v. Aetna Life Ins. Co.,* 174 Tenn. 602, 611, 130 S.W.2d 85, 88 (1939); *Lingner v. Lingner,* 165 Tenn. 525, 529, 56 S.W.2d 749, 750 (1933).[8]

Thus *Cunningham v. Golden* has not become so ingrained in our law that it should be viewed as a rule of property. In the absence of an authoritative interpretation of Tenn. Code Ann. § 36-2-202(a) by the Tennessee Supreme Court, the doctrine of stare decisis does not prevent us from reconsidering one of our own decisions and departing from it if the circumstances require.

### III.

The common law treated children born out of wedlock harshly. Because they were considered to be no one's children, they could not require their biological father to support them and could not inherit from their biological parent. *Allen v. Harvey,* 568 S.W.2d 829, 831-32 (Tenn. 1978); *Swanson v. Swanson,* 32 Tenn. (2 Swan) 445, 453 (1852). Because there was no judicial

---

[7]The United States Supreme Court also declined to review the decision even though Justices White and Blackmun would have noted probable jurisdiction. *Cunningham v. Golden,* 466 U.S. 966, 104 S. Ct. 2336 (1984).

[8]I can find no reliable indication that the Tennessee Supreme Court intended to limit its comments concerning the significance of a simple denial of an application for permission to appeal to multi-issue cases. In fact, just the contrary seems to be the case. See, for example, *Swift v. Kirby*, 737 S.W.2d at 274, in which the sole issue was the correctness of this court's decision in an earlier case that the "equity of redemption" did not include the statutory right of redemption.

remedy, the only way to legitimate a child born out of wedlock was by "the transcendent power of an act of parliament."  1 William Blackstone, *Commentaries* *459.

During the early years of Tennessee's statehood, the General Assembly was frequently called upon to enact legislation to legitimate particular individuals. These acts were looked upon with disfavor; *McCormick v. Cantrell*, 15 Tenn. (7 Yer.) 615, 623 (1835).  The number of these requests had increased so much by 1805 that the General Assembly empowered the courts to legitimate children born out of wedlock.  Act of Oct. 3, 1805, ch. 2, 1805 Tenn. Pub. Acts 4.[9]  The creation of this judicial remedy did not succeed in diverting legitimation matters from the legislature to the courts.  Accordingly, the drafters of the Constitution of 1835 included a provision in the new constitution prohibiting the General Assembly from suspending any general law for the benefit of any particular individual. Tenn. Const. of 1835, art. XI, § 7.[10]  Later, the drafters of the Constitution of 1870 included a provision specifically prohibiting the General Assembly from "pass[ing] acts adopting or legitimatizing persons." Tenn Const. art. XI, § 6.

The original legitimation act provided that

> any of the inperior [sic] or county courts of law in this state, shall have full power and authority to alter the name of any illegitimate person on application of any person wishing to make legitimate any of their offspring not born in wedlock: *Provided*, said applicant

---

[9]The General Assembly's reasons for creating this judicial remedy were clearly reflected in the bill's preamble which stated that "the frequent applications to this General Assembly, have become troublesome, and have a tendency to expose the morals of society, and unnecessarily put the State to considerable expence for public printing, and time of the Legislature."

[10]Tenn. Const. art. XI, § 7 provided:
> The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefits of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunities, or exemptions, other than such as may be, by the same law, extended to any member of the community, who may be able to bring himself within the provisions of such law: *provided* always, the Legislature shall have power to grant such charters of incorporation as they may deem expedient for the public good.

The Tennessee Supreme court later noted that this provision prevented the General Assembly from passing private laws legitimating particular individuals. *Swanson v. Swanson*, 32 Tenn. (2 Swan) at 454.

> intends to make said illegitimate person heir, or joint heir to his or her estate.

Act of Oct. 3, 1805, ch. 2, § 1, 1805 Tenn. Pub. Acts 4. This provision was altered slightly in the 1858 Code of Tennessee to provide:

> The application to legitimate a child not born in lawful wedlock is made by a petition in writing, signed by the person wishing to legitimate such child, and setting forth the reasons therefor.

Code of Tennessee § 3640 (1858). This language has been carried forward essentially unchanged into the current code and was the very language construed in *Cunningham v. Golden. See* Tenn. Code Ann. § 36-2-202(a).[11]

The General Assembly has amended the legitimation statutes twice since the *Cunningham v. Golden* decision, but neither change related to the class of persons permitted to file legitimation actions under Tenn. Code Ann. § 36-2-202(a) or to the class of children for whom legitimation could be requested. In 1992, the General Assembly provided natural fathers with a second procedure for acknowledging the paternity of a child born out of wedlock. It authorized them to execute a notarized "acknowledgment of paternity" at the hospital where the child was born. It also required the hospital to forward the birth certificate and acknowledgment of paternity to the juvenile court and directed the juvenile court to enter an order of legitimation consistent with these documents. Act of Apr. 30, 1992, ch. 1012, § 1, 1992 Tenn. Pub. Acts 1049, 1050 (codified at Tenn. Code Ann. § 36-2-202(b)(1), -202(b)(2) (Supp. 1992)). In addition, the 1992 legislation provided that this new alternate procedure could not be used without the mother's consent and that any order of legitimation based on an "acknowledgment of paternity" could be rescinded if a later blood test proved conclusively that "the named father cannot be the natural father of the child." Act of Apr. 30, 1992, ch. 1012, § 1, 1992 Tenn. Pub. Acts 1049, 1050 (codified at Tenn. Code Ann. § 36-2-202(b)(3), -202(b)(4) (Supp. 1992)).

---

[11] *Compare* Code of Tennessee § 3640 (1858) *with* Shannon's Code of Tennessee § 5406 (1896); Code of Tennessee § 9565 (1932); Tenn. Code Ann. § 36-302 (1955). The General Assembly amended the provision in 1965 to require that the application for legitimation include the state and date of the child's birth. Act of Mar. 2, 1965, ch. 112, § 2, 1965 Tenn. Pub. Acts 418.

The General Assembly amended the "acknowledgment of paternity" procedure in 1994.[12] The apparent purpose of this amendment was to clarify the procedure for filing the notarized acknowledgment of paternity and birth certificate with the juvenile court and to remove the provision permitting the father to use a later blood test to rescind an order of paternity. This amendment also changed the designation of the maternal consent requirement from Tenn. Code Ann. § 36-2-202(b)(3) to Tenn. Code Ann. § 36-2-202(c).[13]

The phrase "child not born in lawful wedlock" in Tenn. Code Ann. § 36-2-202(a) has existed without change for almost one hundred and forty years. Neither of the two amendments to Tenn. Code Ann. § 36-2-202 enacted after the *Cunningham v. Golden* decision altered this phrase. Nothing in the language of the amendments themselves or in their legislative history confirms, or even implies, that the General Assembly intended to depart from the common, traditional meaning of the phrase in favor of the interpretative gloss put on the phrase in *Cunningham v. Golden* or even that it was aware of the *Cunningham v. Golden* decision. Since there is no direct, reliable support for the notion that the General Assembly has somehow approved the *Cunningham v. Golden* decision,[14]

_____

[12]Act of Apr. 21, 1994, ch. 988, § 6, 1994 Tenn. Pub. Acts 1016, 1019.

[13]A panel of the Eastern Section of this court has recently held that Tenn. Code Ann. § 36-2-202(c) is unconstitutional if interpreted to require maternal consent before a natural father may file an application under Tenn. Code Ann. § 36-2-202(a) to legitimate a child. *In re Hood (Vineyard v. Hood),* App. No. 03-A-01-9508-JV-00296, slip op. at 14 (Tenn. Ct. App. June 10, 1996) (No Tenn. R. App. P. 11 application filed). While this analysis is fundamentally sound, the panel could have avoided deciding the constitutional question by pointing out that the legislative history of the maternal consent requirement clearly demonstrates that it applies only to the "acknowledgment of paternity" proceedings under Tenn. Code Ann. § 36-2-202(b), not to legitimation petitions filed directly in court under Tenn. Code Ann. § 36-2-202(a).

[14]The majority makes much of the fact that the General Assembly has not amended Tenn. Code Ann. § 36-2-202(a) since the *Cunningham v. Golden* decision. Citing *Hamby v. McDaniel*, 559 S.W.2d 774, 776 (Tenn. 1977), it asserts that this legislative inaction is "persuasive evidence" that the legislature approves of *Cunningham v. Golden's* construction of "child not born in lawful wedlock." While the majority correctly cites *Hamby v. McDaniel*, reason and common sense caution against reading too much into legislative inaction.

The "inaction doctrine" relied on so heavily by the majority has few defenders today. William H. Eskridge, Jr., *The New Textualism*, 37 U.C.L.A. L. Rev. 621, 640 (1989), *reprinted in* 2A Norman J. Singer, *Statutes and Statutory Construction* 581 (5th ed. 1992). The failure to enact legislation cannot be associated with any particular legislative initiative or proposal, and, as Justice Scalia has pointed out, it is "impossible to assert with any degree of assurance that . . . [legislative] failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to
(continued...)

the 1992 and 1994 amendments to Tenn. Code Ann. § 36-2-202, like the doctrine of stare decisis, should not prevent us from reconsidering the *Cunningham v. Golden* decision.

## IV.

Tennessee's legitimation statutes must be understood and applied not just in light of their historical background but also in light of contemporary circumstances. This court overlooked the common meaning of the phrase "child not born in lawful wedlock" when it decided *Cunningham v. Golden* in 1983 and thereby mistakenly restricted the class of persons permitted to file legitimation actions. As a result, the court placed a cloud over the constitutionality of Tenn. Code Ann. § 36-2-202(a) and also placed the statute in conflict with other statutes dealing with the rights of children whose biological parents are not married to each other. Because the consequences of continuing to follow the erroneous construction of Tenn. Code Ann. § 36-2-202(a) far outweigh the benefits of correcting our mistake, I will not hesitate to reinterpret Tenn. Code Ann. § 36-2-202(a).

## A.

Statutory construction is essentially a judicial function. *Worley v. Weigels, Inc.,* 919 S.W.2d 589, 592 (Tenn. 1996); *Roseman v. Roseman,* 890 S.W.2d 27, 29 (Tenn. 1994). It refers to the process by which the courts ascertain and then give the fullest possible effect to a statute's purpose. *Cronin v. Howe,* 906 S.W.2d 910, 912 (Tenn. 1995); *Wilson v. Johnson County,* 879 S.W.2d 807, 809 (Tenn. 1994). When called upon to construe a statute, the courts must take care not to

---

[14](...continued)
the status quo, or even (5) political cowardice." *Johnson v. Transportation Agency*, 480 U.S. 616, 671-72, 107 S. Ct. 1442, 1472 (1987) (Scalia, J., dissenting).

The General Assembly's decision to limit the availability of the alternative "acknowledgment of paternity" procedure in Tenn. Code Ann. § 36-2-202(b) to children "born to an unmarried woman" does not necessarily indicate that it intended the phrase "child born out of lawful wedlock" in Tenn. Code Ann. § 36-2-202(a) to mean the same thing. It is equally, if not more, plausible that the General Assembly wished to limit the availability of the alternative procedure to only unmarried women in order to protect the interests of a married woman's husband.

unduly restrict the statute's application or conversely to expand its coverage beyond its intended scope. *Kultura, Inc. v. Southern Leasing Corp.,* 923 S.W.2d 536, 539 (Tenn. 1996); *In re Storey (Storey v. Bradford Furniture Co.),* 910 S.W.2d 857, 859 (Tenn. 1995); *In re Conservatorship of Clayton (Salvatore v. Clayton),* 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995).

The search for a statute's purpose necessarily begins with the words of the statute itself. *Spencer v. Towson Moving & Storage, Inc.,* 922 S.W.2d 508, 510 (Tenn. 1996); *Winter v. Smith,* 914 S.W.2d 527, 538 (Tenn. Ct. App. 1995). Unless the legislature signals otherwise, we assign these words their natural and ordinary meaning. *State ex rel. Metro. Gov't v. Spicewood Creek Watershed Dist.,* 848 S.W.2d 60, 62 (Tenn. 1993). We consider not only the immediate context in which the words appear, *McClain v. Henry I. Siegel Co.,* 834 S.W.2d 295, 296 (Tenn. 1992), but also the statute's overall purposes and established public policy. *State v. Turner,* 913 S.W.2d 158, 160 (Tenn. 1995) (consideration of the statute's overall purposes); *Cronin v. Howe,* 906 S.W.2d at 912 (consideration of public policy).

When possible, we must avoid constructions that render any part of a statute inoperative or void, *Tidwell v. Collins,* 522 S.W.2d 674, 676-77 (Tenn. 1975); *Mangrum v. Owens,* 917 S.W.2d 244, 246 (Tenn. Ct. App. 1995), or that place one statute in conflict with another. *State ex rel. Boone v. Sundquist,* 884 S.W.2d 438, 444 (Tenn. 1994); *State ex rel. Metro. Gov't v. Spicewood Creek Watershed Dist.,* 848 S.W.2d at 62. Thus, the meaning of an ambiguous word or phrase in one statute may be discovered by considering the language and purpose of related statutes. *State v. Blouvett,* 904 S.W.2d 111, 113 (Tenn. 1995); *Roseman v. Roseman,* 890 S.W.2d at 29; *Lyons v. Rasar,* 872 S.W.2d 895, 897 (Tenn. 1994).

The courts should construe unambiguous statutes according to their plain meaning. *Atchley v. Life Care Ctr.,* 906 S.W.2d 428, 431 (Tenn. 1995); *Neff v. Cherokee Ins. Co.,* 704 S.W.2d 1, 3 (Tenn. 1986). When, however, a statute is ambiguous or unclear, we may resort to the various rules of statutory construction to ascertain its purpose and the proper scope of its application. No single rule of construction is preferable to the others, and thus we should bring all applicable

rules to bear in order to ascertain a statute's meaning and application. *O.H. May Co. v. Anderson,* 156 Tenn. 216, 219-20, 300 S.W. 12, 14 (1927); *Davenport v. Chrysler Credit Corp.,* 818 S.W.2d 23, 27 (Tenn. Ct. App. 1991).

**B.**

Tenn. Code Ann. § 36-2-202(a) must be construed in light of its contemporary milieu. The law and society's attitude toward children born to women who are not married to the child's biological father have changed significantly since the late eighteenth century when Lord Mansfield decided *Goodright v. Moss.*[15] We do a disservice not only to the parties in this case but also to the law itself if we permit our understanding and application of old statutes to be frozen in a pattern imposed by an earlier generation's prejudices and limitations.

One-third of all children born in Tennessee today are born to unmarried mothers.[16] The legal position of these children is markedly different than that of their counterparts two hundred years ago. They have a statutory right to inherit from their biological mother and father.[17] They have a statutory right to receive support from both of their biological parents.[18] In addition, they have a

---

[15]The presumption that a child born to a married woman was the offspring of the mother's husband has been traced to *Goodright v. Moss,* 2 Cowp. 591, 98 Eng. Rep. 1257 (1777), and is commonly referred to as "Lord Mansfield's Rule." It stems from Lord Mansfield's statement that "the declarations of a father or mother, cannot be admitted to bastardize the issue born after marriage." *Goodright v. Moss,* 2 Cowp. at 592, 98 Eng. Rep. at 1257. Despite its widespread acceptance, Lord Mansfield's Rule has not escaped serious academic criticism. *See* 7 John Henry Wigmore, *Evidence in Trials at Common Law* §§ 2063, 2064 (James H. Chadbourn rev. 1978).

[16]Bureau of the Census, U.S. Dep't of Commerce, *Statistical Abstract of the United States*: 1995, at 77 (115th ed. 1995) (statistics demonstrating that three of every ten live births in 1992 were to an unmarried woman). The nonmarital birth rate in Tennessee has increased 252% during the past thirty years. In 1994, 33.4% of the children born in Tennessee were born to unmarried mothers. Tennessee Comm'n on Children & Youth, *Kids Count: The State of the Child in Tennessee, 1995,* at 8 (1996).

[17]Tenn. Code Ann. § 31-2-105 (Supp. 1996).

[18]Tenn. Code Ann. § 34-11-102(a) (Supp. 1995); Tenn. Code Ann. § 36-2-102 (1991); Tenn. Code Ann. § 36-2-203 (1991).

constitutional right not to be discriminated against because of the marital status of their biological parents.[19]

Along with these improvements in the legal status of children whose biological parents are not married to each other, the Tennessee Supreme Court has redefined and expanded the parental rights of biological parents. Like many of its counterparts in other states, the Court has held unequivocally that parents, notwithstanding their marital status, possess fundamental rights with regard to their biological children. *Petrosky v. Keene,* 898 S.W.2d 726, 728 (Tenn. 1995); *Nale v. Robertson,* 871 S.W.2d 674, 678 (Tenn. 1994).[20] Thus, in contemporary society, the legal rights and status of children and their parents do not necessarily depend upon whether the parents were married to each other when their child or children were born.

Until relatively recent times, Lord Mansfield's Rule provided a convenient substitute for either unavailable or unreliable proof of parentage. In the place of inherently suspect testimony from the child's mother or father, the rule confirmed that legitimacy of all children should be a societal norm. This rebuttable presumption of legitimacy[21] for children born to a married woman placed the burden on those desiring to prove otherwise to rebut the presumption with clear, strong, and convincing proof. *Gower v. State,* 155 Tenn. 138, 144, 290 S.W. 978,

---

[19]*Pickett v. Brown,* 462 U.S. 1, 18, 103 S. Ct. 2199, 2209 (1983) (statute of limitations for seeking child support from a biological father); *Gomez v. Perez,* 409 U.S. 535, 538, 93 S. Ct. 872, 875 (1973) (right to child support from a biological parent); *Weber v. Aetna Casualty & Sur. Co.,* 406 U.S. 164, 175-76, 92 S. Ct. 1400, 1406-07 (1972) (right to receive worker's compensation benefits).

[20]The reasoning of these decisions indicate that the Tennessee Supreme Court has concluded that the Constitution of Tennessee provides broader protection for the rights of biological parents than does the United States Constitution. Thus, the Tennessee Supreme Court has not followed Justice Scalia's plurality opinion that unmarried fathers do not have a constitutionally protected liberty interest in their relationship with their biological children born to married mothers. *See Michael H. v. Gerald D.,* 491 U.S. 110, 113-32, 109 S. Ct. 2333, 2337-46 (1989).

[21]Several more recent intermediate appellate court decisions have characterized a related presumption as conclusive. *See Rooker v. Rimer,* 776 S.W.2d 124, 128 (Tenn. Ct. App. 1989); *Tyler v. Tyler,* 671 S.W.2d 492, 494 (Tenn. Ct. App. 1984). While the presumption of legitimacy has been viewed as one of the strongest known to the law, *Anderson v. Anderson,* 52 Tenn. App. 241, 260, 372 S.W.2d 452, 461 (1962), the Tennessee Supreme Court has never held that it is conclusive. *See Pressley v. Pressley,* App. No. 03-A-01-9311-CV-00400, slip op. at 4 (Tenn. Ct. App. Feb. 10, 1995) (Susano, J., concurring) (No Tenn. R. App. P. 11 application filed).

980 (1927); *Jackson v. Thornton,* 133 Tenn. 36, 39, 179 S.W. 384, 384 (1915); *Frazier v. McFerren,* 55 Tenn. App. 431, 440, 402 S.W.2d 467, 472 (1964); *State ex rel. Hardesty v. Sparks,* 28 Tenn. App. 329, 335, 190 S.W.2d 302, 304-05 (1945). This presumption is no longer required because of the widespread availability of highly reliable scientific tests that can prove or disprove parentage. *See* Tenn. Code Ann. §§ 24-7-112, -117 (Supp. 1996) (applications of blood, genetic, and DNA testing).

## C.

The phrase "child not born in lawful wedlock" and similar phrases have a long history of judicial construction. Only the *Cunningham v. Golden* decision and the few Tennessee cases following it have limited its meaning to children born to an unmarried mother. Virtually every other court considering the question has held that the term "wedlock" in these phrases refers to the marital status of the child's biological parents with regard to each other.[22] Thus, phrases such as "child born out of lawful wedlock" have been consistently construed to include not only children born to unmarried women but also children whose biological parents are not married to each other.[23]

In addition to being out of step with the prevailing understanding of the meaning of the phrase, the construction of "child born out of lawful wedlock" in *Cunningham v. Golden* places Tenn. Code Ann. § 36-2-202 on a collision course

---

[22]*K.S. v. R.S.,* No. 55S04-9602-CV-00162, 1996 WL 420400, at *3 (Ind. July 29, 1996); *Pursley v. Hisch,* 85 N.E.2d 270, 271 (Ind. App. Ct. 1949); *Smith v. Robbins,* 283 N.W.2d 725, 729 (Mich. Ct. App. 1979); *In re Legitimation of Locklear,* 334 S.E.2d 46, 50-51 (N.C. 1985); *State v. Coliton,* 17 N.W.2d 546, 551 (N.D. 1945); *In re Estate of Marriott,* 515 P.2d 571, 573 (Okla. 1973); *see also* Unif. Act on Paternity § 1, 9B U.L.A. 350 (1987); *but see Weidenbacher v. Duclos,* 661 A.2d 988, 992 n.11 (Conn. 1995) (declining to decide the meaning of "child born out of wedlock").

[23]*Leonard v. Leonard,* 360 So. 2d 710, 712 (Ala. 1978); *Estey v. Mawdsley,* 217 A.2d 493, 494 (Conn. Cir. Ct. 1966); *Wilkins v. Georgia Dep't of Human Resources,* 337 S.E.2d 20, 22 (Ga. 1985); *Johnson v. Studley-Preston,* 812 P.2d 1216, 1219 (Idaho 1991); *K.S. v. R.S., supra* note 21, at *3; *Pursley v. Hisch,* 85 N.E.2d at 271; *Bartlett v. Commonwealth,* 705 S.W.2d 470, 472 (Ky. 1986); *Spielmaker v. Lee,* 517 N.W.2d 558, 559 (Mich. Ct. App. 1994); *Girard v. Wagenmaker,* 434 N.W.2d 227, 228 (Mich. Ct. App. 1988), *rev'd on other grounds*, 470 N.W.2d 372 (1991); *State ex rel. Madsen v. Soldier,* No. A-94-747, 1996 WL 169877, at *3 (Neb. Ct. App. April 9, 1996); *Commissioner of Pub. Welfare v. Koehler,* 30 N.E.2d 587, 589 (N.Y. 1940); *Batcheldor v. Boyd,* 423 S.E.2d 810, 813 (N.C. Ct. App. 1992); *State v. Coliton,* 17 N.W.2d at 551.

with other statutes defining the rights and responsibilities of unmarried biological parents and their children. Our legitimation statutes,[24] paternity statutes,[25] and statute pertaining to intestate succession[26] are all intended to remove the common-law disabilities of children born to parents who are not married to each other. These statutes define the obligation of biological parents to support their children and also define the rights of these children to support and to inherit from both biological parents. Notwithstanding earlier decisions drawing nice distinctions between the "purposes" of these statutes,[27] they should be construed in pari materia in order to assure that their operation and effect is uniform and consistent.

The paternity statutes apply to children "born out of lawful wedlock." Tenn. Code Ann. § 36-2-101(1). We have repeatedly construed this phrase in the context of paternity proceedings to include children who are born to an unmarried woman and to children who are born to a married woman whose husband is not the child's biological father. *Tindle v. Gay,* 891 S.W.2d 617, 618 (Tenn. Ct. App. 1994); *Frazier v. McFerren,* 55 Tenn. App. at 438, 402 S.W.2d at 471.[28] Likewise, we have construed the statute giving persons "born out of wedlock" the right to inherit from their biological parents in a similar fashion. *In re Estate of Armstrong (Adams v. Manis),* 859 S.W.2d at 327.

Construing Tenn. Code Ann. § 36-2-202(a) to apply to children whose mother is not married to their biological father is consistent with the Tennessee Supreme Court's recognition of the rights of biological parents who have taken positive steps to establish a relationship with their children. *Nale v. Robertson,* 871 S.W.2d at 678. While promoting consistency among our statutes, it also

---

[24]Tenn. Code Ann. §§ 36-2-201, -209 (1991 & Supp. 1995).

[25]Tenn. Code Ann. §§ 36-2-101, -115 (1991 & Supp. 1995).

[26]Tenn. Code Ann. § 31-2-105.

[27]*In re Estate of Armstrong (Adams v. Manis),* 859 S.W.2d 323, 327 (Tenn. Ct. App. 1993) (finding no connection between the legitimation and intestate succession statutes); *Matthews v. White,* App. No. 02-A-01-9210-JV-00295, slip op. at 4-5 (Tenn. Ct. App. July 1, 1993), *perm. app. denied* (Tenn. Nov. 1, 1993) (the purpose of the paternity statutes differs from the purpose of the legitimation statutes).

[28]*See also Webb v. Dunlap,* App. No. 03-A-01-9406-JV-00211, slip op. at 4-5 (Tenn. Ct. App. Dec. 6, 1994) (No Tenn. R. App. P. 11 application filed); *Matthews v. White, supra* note 26, slip op. at 4; *Bass v. Norman,* C.A. No. 164, slip op. at 4-5 (Tenn. Ct. App. Dec. 29, 1989) (No Tenn. R. App. P. 11 application filed).

aligns Tennessee with approximately two-thirds of our sister states that give putative fathers the right to rebut the presumption that a child born to a married woman is the issue of the marriage. *State ex rel. Roy Allen S. v. Stone,* No. 23355, 1996 WL 328367, at *12 (W. Va. June 14, 1996); *Weidenbacher v. Duclos,* 661 A.2d at 999; Traci Dallas, Note, *Rebutting the Marital Presumption: A Developed Relationship Test,* 88 Colum. L. Rev. 369, 373-74 (1988).

## V.

The courts should avoid construing statutes in a way that renders them constitutionally suspect. *State ex rel. Mynatt v. King*, 137 Tenn. 17, 31, 191 S.W. 352, 355 (1917); *Illinois Cent. R.R. v. Crider*, 91 Tenn. 489, 506, 19 S.W. 618, 622 (1892). We should also avoid deciding constitutional issues unless required to do so. *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995); *Watts v. Memphis Transit Management Co.*, 224 Tenn. 721, 727, 462 S.W.2d 495, 498 (1971); *Stokes v. Leung*, 651 S.W.2d 704, 711 (Tenn. Ct. App. 1982). My construction furthers both goals.

In addition to creating disharmony between Tenn. Code Ann. § 36-2-202(a) and Tenn. Code Ann. §§ 31-2-105 & 36-2-101(1), the majority's interpretation also places the statute on a collision course with the Due Process and Equal Protection Clauses of the Constitution of Tennessee. My construction of Tenn. Code Ann. § 36-2-202(a) avoids these constitutional infirmities. Accordingly, I do not join in the discussion of the constitutionality of Tenn. Code Ann. § 36-2-202(a) in Section IV of the majority's opinion. In my mind, Tenn. Code Ann. § 36-2-202(a), as construed by the majority, deprives putative biological fathers of a fundamental constitutional right without due process of law.

The courts should not permit legitimation proceedings to be used as a vindictive vehicle to disrupt families. Putative fathers seeking the benefits and obligations that flow from parentage must act promptly and in good faith to demonstrate their desire to establish a parental relationship with their biological

children.  In this case, Mr. Evans's prompt actions, coupled with Ms. Steelman's concessions about the child's parentage, indicate that Mr. Evans is not seeking to disrupt an intact family for an improper reason.  Accordingly, I would find that he has standing to pursue this legitimation proceeding.

_____
WILLIAM C. KOCH, JR., JUDGE